**Vincent James LANDANO, Petitioner,**

v.

**John J. RAFFERTY, Superintendent, Rahway State Prison, and Irwin I. Kimmelman, Attorney General of the State of New Jersey, Respondents.**

**Civ. A. No. 85–4777.**

United States District Court,
D. New Jersey.

Sept. 29, 1987.

Neil Mullin, Smith, Mullin & Kiernan, P.C., West Orange, N.J., for petitioner.

Leslie Schwartz, Deputy Atty. Gen., Appellate Div., Office of the Atty. Gen., Trenton, N.J., for respondents.

## OPINION

SAROKIN, District Judge.

The murder of a police officer is a tragic event, not only for the loss sustained by the officer's family, but because it is the ultimate symbol of lawlessness. That tragedy is compounded however, if there is a risk that an innocent person has been convicted of such a despicable crime. The record in this case demonstrates that there is just such a risk, but because of binding

precedent this court is powerless to grant the relief which petitioner seeks and to which this court believes he is entitled.

A critical prosecution eyewitness, a public spirited citizen who came forward with evidence immediately after the crime, now once again has voluntarily come forward to cast doubt upon petitioner's conviction and his own testimony which may have caused it.

Although discussed in more detail hereafter, the witness, Raymond Portas has testified under oath that (1) when he was first asked to identify the driver of the automobile (the driver being identified by others as the murderer) some months after the crime from a photo array, he selected someone other than the petitioner Mr. Landano; (2) that photograph was removed by the police never to be seen or identified again; (3) that incident is corroborated by the fact that two photos are missing from that array and their absence is unexplained; (4) thirteen days later while waiting to testify, Mr. Landano and his attorney walked by Mr. Portas and he did not recognize Mr. Landano; (5) an officer informed Mr. Portas with respect to these two persons that one was "our man"; (6) even then, Mr. Portas did not know which of the two was the alleged perpetrator; (7) he only made that determination by process of elimination—when the lawyer rose to speak, he concluded the remaining person was the one he was to identify, which he did.

His qualms of conscience were not slow in festering. Immediately upon the conclusion of his testimony he considered speaking to the judge. Doubting its propriety, he sought out the counsel of a priest, who assured him that the police knew what they were doing and not to be concerned. His concerns were allayed but never completely extinguished. He undoubtedly took comfort from the fact that other evidence existed which supported the conviction which was subsequently entered.

However, years later, in reading a magazine article about the case, he learned that much of the other evidence was suspect and realized that his testimony rather than being merely corroborative was crucial to the outcome. All of his qualms were reawakened. Again acting out of the purest and most honorable of motives he went not to the defendant or his counsel, but rather to the prosecution to express his concerns and doubts. The prosecutor's officer turned a deaf ear to his entreaties, and then and only then, did he communicate with the defense after first tracking down the author of the magazine article to ascertain defense counsel's identity.

True there are some discrepancies and inconsistencies in Mr. Portas' testimony and contrary evidence offered by the prosecution. But on the critical facts Mr. Portas has not waivered since he brought these matters to the attention of the parties. He is an honorable, intelligent and obviously conscientious person. He has no reason or motive to lie. His self doubts were not the result of a lengthy process or intercession by anyone, but followed immediately upon his testimony—even before the conviction.

This court conducted a hearing and found the testimony of Mr. Portas to be believable. If the jury had heard what he has now revealed, it might never have convicted the petitioner. On the other hand, the state court found Mr. Portas' testimony on these matters to be incredible; and denied a new trial. The obligation of this court to defer to the factual findings of the state court makes it impossible to grant the relief sought. The court candidly admits an exhaustive search for grounds to grant the writ, but could find none without violating the court's oath to follow existing precedent. In upholding the law, the court fears that a great injustice has occurred and respectfully invites reversal of its decision.

## PROCEDURAL HISTORY

Petitioner, Vincent James Landano, comes before this court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

On October 6, 1976 petitioner was indicted by a Hudson County Grand Jury on one count of felony murder (N.J.S.A. 2A:113–1 and 2), three counts of armed robbery (N.J.S.A. 2A:141–1 and 1A:151–5), one count of

breaking and entering with intent to steal (N.J.S.A. 2A:94-1), one count of receiving a stolen motor vehicle (N.J.S.A. 2A:139-3), one count of illegal possession of a firearm (N.J.S.A. 2A:151-41) and one count of conspiracy to commit armed robbery (N.J.S.A. 2A:98-1). Also named in the indictment were three codefendants, Allen Roller, Victor Forni and Bruce Reen.

On April 6, 1977, the prosecution of codefendants Forni and Reen, each of whom was then confined in New York and contesting extradition, was severed from that of petitioner and codefendant Roller.

On April 18, 1977, Roller entered a plea of *non vult* to the felony murder charge alleged in the first count of the indictment pursuant to a plea agreement reached with the Hudson County Prosecutor. The agreement provided that Roller would testify against petitioner at trial.

The following day, April 19, 1977 petitioner's trial began before the Honorable Maurice A. Walsh, Jr., J.S.C., and a jury. Following 19 days of trial, on May 17, 1977 petitioner was found guilty on all counts. As a result of the jury's verdict, the court sentenced petitioner to life imprisonment on the felony murder count and a consecutive seven to fifteen year term for the remaining offenses.

Petitioner filed a Notice of Appeal on June 29, 1977. On September 26, 1978, petitioner filed a motion in the Superior Court of New Jersey, Appellate Division seeking remand to the trial court for consideration of a motion for a new trial on the basis of newly discovered evidence. An order granting that motion was subsequently entered by that court on October 17, 1978.

On November 20, 21 and 27, 1978 evidentiary hearings pursuant to petitioner's new trial application were conducted before Judge Walsh. By opinion and order dated December 1, 1978, Judge Walsh denied petitioner's application. Thereafter, on March 21, 1980, the Superior Court of New Jersey, Appellate Division denied both petitioner's direct appeal and the consolidated appeal from the denial of a motion for new trial. Landano's petition for certification was denied by the New Jersey Supreme Court on July 8, 1980. *See State v. Landano,* 85 N.J. 98, 425 A.2d 264 (1980).

On March 31, 1982, petitioner filed a verified petition for post-conviction relief and supporting brief. Hearings pursuant to this petition were conducted before the Honorable Joseph P. Hanrahan, J.S.C. on June 16, September 22, October 6 and 28, and November 17, 1982. Judge Hanrahan issued a series of letter opinions concerning the numerous issues raised and ultimately denied the relief sought in an order dated January 4, 1984.

Petitioner appealed Judge Hanrahan's ruling to the Appellate Division. On January 30, 1984, that court denied petitioner's appeal. On June 13, 1984, the Supreme Court of New Jersey denied certification.

On October 10, 1985, petitioner filed the instant habeas corpus petition. Having properly exhausted the available state remedies, petitioner's application is ripe for disposition by this court.

As grounds for relief petitioner alleges: (1) that his due process rights to a fair trial were infringed by the admission of Raymond Portas' identification testimony; (2) that the state unlawfully suppressed exculpatory and material evidence that would have impeached the testimony of codefendant Allen Roller; (3) that the state unlawfully suppressed exculpatory and material evidence that would have impeached the testimony of Jacob Roth, victim of the armed robbery; and (4) that the state court's coercive charge to the jury violated the petitioner's Sixth Amendment right to an impartial jury.[1]

---

1. Petitioner's original application included an allegation that the state unlawfully suppressed information of Gregory Snow's involvement in the instant crime; information which petitioner claims would have been both exculpatory and material. However, this court notes that Judge Hanrahan in his opinion denying petitioner's post-conviction relief application specifically found that "[a] police report referring to Officer Snow's son's involvement in this trial was made available to [petitioner] prior to trial". Counsel for petitioner does not dispute that such report or reports were available at trial but contends that additional information exists, namely, a

## FACTS

The underlying facts may be distilled from the many state court opinions. The events leading up to the crime for which petitioner was convicted involved the activities of a "motorcycle gang" known as "The Breed". According to testimony at trial by Breed members and affiliates, the Breed frequently planned and executed armed robberies in the Staten Island area. Testimony at trial revealed that in June 1976 Allen Roller, president of The Breed's Staten Island chapter, together with Victor Forni, not a "Breed" member but reputedly responsible for organizing most Breed criminal endeavors, conceived a plan to rob the Kearny, New Jersey Check Cashing Service owned and operated by Jacob Roth.

Though it was undisputed at trial that petitioner, Vincent James Landano, was neither a Breed member nor a Breed affiliate, co-defendant Roller testified that petitioner had been specifically recruited for this job when another Breed affiliate refused to participate. Roller admitted that Forni and not petitioner was responsible for orchestrating the Kearny robbery, but Roller vigorously denied Forni's participation in the crime's execution. Roller's testimony revealed that petitioner was a long standing friend of Forni's and that Forni had suggested recruiting Landano for this job.

In the early morning hours of August 13, 1976, Allen Roller together with a "dark-haired" associate who Roller identified as the petitioner arrived at the Hi-Way Cash Checking Service. Roller testified that he approached the window of the Roth check cashing trailer, forced his way into the trailer and controlling the occupants with his gun, proceeded to steal the available cash.

During this time a Newark patrol car driven by Patrolman John Snow arrived in the Roth parking lot. The dark haired perpetrator approached the vehicle and opened fire at close range killing Officer Snow. Thereupon the perpetrator reached inside the vehicle and removed an attache case containing $46,000 intended for delivery to Hi-Way Checking.

Roller testified that the two immediately returned to their vehicle and sped away from the crime scene with petitioner driving and Roller in the back seat. According to Roller, petitioner confessed upon return to the car that he had had to "ice [or waste] the cop". It was later discovered that the gun used to kill Officer Snow was Forni's gun.

Joseph Pasciutti, an employee of an adjacent warehouse, testified that he had witnessed a dark haired man approach the patrol car in The Hi-Way Check Cashing parking lot. Pasciutti testified that he had momentarily turned away from the crime scene and that his back had been turned when he heard three or four gunshots. When Pasciutti redirected his attention to the check cashing facility, he testified that he saw a Chevy pulling away and that the dark haired perpetrator was driving. Pasciutti was not able to identify petitioner as the dark haired perpetrator.

In an effort to escape the crime scene, the vehicle proceeded through Kearny and came upon a blocked intersection. The driver's frantic efforts to escape the traffic attracted the attention of Raymond Portas, a truck driver whose truck was stopped in the intersection. Portas testified that he viewed the vehicle manuever onto nearby train tracks and proceed to drive along the rail. Though unable to identify Roller as the vehicle's passenger, Portas testified at trial that petitioner was the driver of the car.

The evidence presented against petitioner at trial included Roller's testimony naming Landano as his partner in crime; Pasciutti's testimony that the dark haired perpetrator responsible for killing Officer Snow

taped interview. However, the existence of the tape was known to defense counsel at the time of trial as it is referred to in the reports that were produced upon discovery. *See* Habeas Corpus petition, dated October 9, 1985 at 27. In light of the fact that counsel was free to request such information, and that the state was acting in good faith by disclosing the tape's existence, the court finds that this claim is not the proper basis for habeas corpus relief. Therefore, the court will focus its attention on the other claims enumerated.

was also the driver of the getaway car and Portas' identification of petitioner as the driver of the vehicle identified as the getaway car.

## DISCUSSION

### I. *The Portas Identification*

█ In bringing this habeas corpus application, petitioner alleges a deprivation of his due process right to a fair trial as a result of the improper admission of Raymond Portas' identification testimony. In large part, the basis for petitioner's motion results from information discovered subsequent to trial as the result of Mr. Portas' recantation of his trial testimony.[2]

The court begins its analysis by noting that Raymond Portas was a critical prosecution witness. Through the testimony of Joseph Pasciutti, an employee of an adjacent warehouse who witnessed the crime, the state was able to establish that the "dark-haired" perpetrator, responsible for killing Officer Snow, was the driver of the getaway car. *See* Trial Transcript of April 28, 1977, VIIIT at 90–92. Pasciutti however, was unable to identify petitioner as the driver; and, in fact, described the driver as having "curly hair" and "no moustache" whereas a photo or petitioner taken on the day of the crime, some hours after the shooting occurred, reveals Landano to have had long straight hair and a prominent, bushy moustache. *See* Trial Exhibit D–13. Raymond Portas was the only witness presented at trial who was able to identify petitioner as the driver of the car and thus create the inference that petitioner had killed Officer Snow.

Mr. Portas, employed as a truck driver in August 1976, testified at trial that on August 13, 1976 he had witnessed petitioner and another passenger as they drove through an intersection in Kearney. Portas testified that his attention had been drawn to this car because of its erratic driving pattern. The driver, seeking to avoid a blocked intersection, manuevered the car onto nearby railroad tracks and proceeded to drive along the parallel tracks. According to Portas, due to the vehicle's backward maneuvering he had a more direct view of the driver than the passenger and was able to view the driver full face at a distance of approximately fifteen feet for a minute and a half. *See* Transcript of Portas Voir Dire testimony, April 25, 1977, at 48–50; Trial Transcript at 8.45.

At trial it was established that prior to his court appearance, Mr. Portas had had two opportunities to view photographs in an effort to identify the perpetrators of the crime. The first viewing took place on August 13, 1976, the day of the crime, at which time Portas was asked to identify the backseat passenger. The record reflects that Portas erroneously identified William Applegate, and not co-defendant Roller.

---

**2.** Relying on the Supreme Court's holding in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), petitioner argues that without even reaching the merits of Portas' post-trial testimony and the undue influence alleged, the record supports a finding that it was error for the trial court to admit Portas' out-of court identification. Addressing the reliability factors set forth in *Biggers*, petitioner contends that the lapse of eight months between the confrontation and Portas' photographic identification, Portas' momentary viewing of the perpetrators, Portas' inability to correctly identify Roller as the passenger and finally, Portas' description of petitioner as having no moustache, cumulatively compel a finding that there existed a significant likelihood of misidentification. This court cannot agree.

First, the *Biggers* analysis is only triggered where it can be illustrated that the identification procedure was suggestive. Reviewing the

record devoid of Portas' recantation, there is no basis upon which to conclude that the photographic identification was suggestive. Portas testified at the *Wade* hearing that he had been shown an array of dark haired perpetrators (S–2) and that he was able to select petitioner's photograph without any prompting. While Portas admitted that the prosecutor had confirmed his choice remarking "That's him", there was no allegation prior to the recantation that this remark preceded or in any way influenced the identification. In view of the fact that at the time of the *Wade* review Portas demonstrated certainty in his identification of petitioner and further that Portas testified to having had an unobstructed view of petitioner in close proximity and to having paid acute attention to the car's maneuvering; this court concludes that it was not a violation of due process for the trial court to have admitted Portas' identification on the record as it stood at the time of trial.

Subsequently, on April 15, 1977, almost eight months after the crime and ten days before trial, Portas was summoned to the Hudson County Prosecutor's office. Portas testified that he was shown two groups of photos on this occasion, one of "men with beards" and the other of dark-haired perpetrators. *See* Trial Transcript, April 28, 1977, at 8.43–8.46; 8.59. Portas acknowledged having difficulty selecting the backseat passenger noting that the individual depicted looked "fatter" than he recollected. *See* Trial Transcript at 8.43.

However, of critical significance to the state's case, Portas testified that he was able to positively identify petitioner's photo from the second array. Trial Transcript at 8.45.[3] Portas testified that he believed petitioner to be the driver of the car. Trial Transcript at 8.46:1. In response to the prosecutor's inquiry "Do you see the man in court today who you believe to be the driver of the vehicle?", Portas responded affirmatively and identified the petitioner. Trial Transcript 8.46:9–14.

On cross-examination, Portas testified that after having identified petitioner's photo (marked S–2A for identification) in the prosecutor's office, a member of the prosecutor's staff present in the room confirmed the identification responding "Yes. That's him". Trial Transcript at 8.62. On redirect examination however Portas averred that he was not given any indication of which photograph to select prior to his independent identification and that any confirming remark followed his independent selection. Trial Transcript at 8.63. Furthermore, the prosecutor elicited testimony establishing that Portas' in-court identification of the petitioner was based on his "recollection of the incident of August 13th [1976]" and not the product of any suggestion made to him upon selection of petitioner's photograph thirteen days earlier. Trial Transcript at 8.64:8–13.

In 1982, approximately five years after petitioner's trial, Portas came forward seeking to recant his testimony. Portas' recantation was made part of petitioner's application for post-conviction relief addressed to the New Jersey Superior Court. An evidentiary hearing was granted, and conducted by the Honorable Joseph P. Hanrahan in October 1982.

Portas' testimony at this post-conviction hearing differed from his trial testimony in two critical aspects: (1) Contrary to his prior testimony, Portas revealed that he was unable to independently identify petitioner's photo on April 15, 1977. On October 6, 1982 Portas recalled that upon being shown a series of photos of dark-haired perpetrators he first selected a photo of an individual other than the petitioner. According to Portas, the prosecutor "picked up the picture I picked out and handed it to the other fellow and he left the room". *See* Transcript of October 6, 1982 Evidentiary Hearing at 7. Portas further testified that to the best of his recollection, he never saw that photograph again. October 6, 1982 Hearing at 8.

Portas testified that after having removed this first selection, the prosecutor allowed Portas to continue reviewing the remaining photographs while engaging him in casual conversation. Portas recalls that at one point he remarked to the prosecutor: "You know, if this man wasn't so fat, I would have picked him". October 6, 1982 Hearing at 8. According to Portas the prosecutor responded to this tentative selection by saying "That's the man we want" and asking Portas to initial the back of the photograph. October 6, 1982 Hearing at 9. This second photo was of the petitioner Vincent James Landano. In an affidavit sworn to by Mr. Portas, dated November 20, 1981, Mr. Portas certified that "[i]f, on April 15, a detective had not said we think he is the one I would not have signed Landano's photograph". October 6, 1982 Hearing at 40.

(2) Portas testified that prior to his in-court identification of Mr. Landano he had been seated in the hallway outside the courtroom. Two gentlemen whom he describes as well-dressed passed him in the hallway. Portas testified on direct exami-

---

**3.** Portas identification of Landano was memorialized in a sworn statement executed with the assistance of Detective Frank Xavier on April 15, 1977.

nation that he had not recognized the petitioner when petitioner passed him in the hallway. October 6, 1982 Hearing at 10–11. Immediately following, Mr. Portas entered the men's room where he was approached by a person whom he assumed to be a detective. According to Mr. Portas the detective asked him: "Do you know who the two were that just went in?". Without awaiting a response, the detective then remarked to Portas "You know, that's our man". October 6, 1982 Hearing at 10. Shortly thereafter, Portas entered the courtroom and identified the petitioner as the man he had seen driving the getaway car on August 13, 1976.

Mr. Portas testified that this "bathroom incident" in particular had given him great pause. He testified that he "was not sure" of his identification of the petitioner, not sure that he "shouldn't have told somebody that a policeman followed [him] into the bathroom to tell [him], to make sure [he] picked out the guy". October 6, 1982 Hearing at 15 and 17. Portas testified that he believed he had been "influenced" in his identification. *See* Transcript of October 28, 1982 Hearing at 53. In his own words, Portas explained "It's very hard to know whether you've been influenced or not, as far as I'm concerned. I don't know". October 6, 1982 hearing at 68.

As a result of this uneasiness, Portas testified that he considered going to see the judge immediately, but chose instead to contact his priest, Father Ashe. October 28, 1982 Hearing at 53. Portas voluntarily applied to Father Ashe for assistance within a day or two of his testimony; prior to return of a guilty verdict. Having been assured by his priest that the police and the prosecutor "know what they are doing"; Portas let the matter rest. It was not until the publication of a magazine article in the October 1981 issue of the New Jersey Monthly analyzing Landano's trial and depicting the conviction as having been based upon a paucity of evidence, that Mr. Portas' concerns were revived and he took the

initiative in communicating with petitioner's counsel concerning a recantation.[4]

In an opinion dated December 3, 1982, the court denied petitioner's application for a new trial based on Portas' recantation. As set forth in the court's opinion, the state standard for evaluating a recantation upon a motion for a new trial is "whether it casts serious doubt upon the truth of the testimony given at the trial and whether, if believable, the factual recital of the recantation so seriously impugns the entire trial evidence as to give rise to the conclusion that there resulted a possible miscarriage of justice". *State v. Puchalski,* 45 N.J. 97, 107–08, 211 A.2d 370 (1965). Therefore, as a threshold matter the court had to find, as a matter of fact, that Portas' recanting statement was believable. Only upon such a factual determination could the court apply the requisite legal analysis and conclude as a matter of law that the trial testimony was so seriously impugned as to support the conclusion that there resulted a possible miscarriage of justice.

The court however, found Portas' testimony to be "untrustworthy" and therefore "lack[ing] the capacity to cast serious doubt upon the truth of his trial testimony". *See* State's Appendix, Volume II at 230A. Having observed Portas' "manner of expression, sincerity, candor, and straightforwardness", the court explained that it had "received the impression that Mr. Portas [felt] that he 'pressed the button' that condemned Landano". *Id.* at 227A. After summarily reviewing the other evidence presented at trial, the court determined that Portas' concern for having single-handedly convicted Landano was "clearly without merit". *Id.* at 230A.

As to the bathroom incident, the court found: (1) that it was conceivable that a large number of people might have been in that hallway; (2) that there was no reason for Portas to have noticed the particular two men in question; (3) that Portas "assumed", but was not certain that the man

---

**4.** Portas testified that his initial effort was to contact the state with the information concerning the bathroom incident and the tampered photo identification. However, according to Mr. Portas the prosecutor's office informed him that "they didn't think it mattered". *See* Transcript of October 6, 1982 Hearing, at 28.

who had followed him into the bathroom was a detective; (4) that Portas did not see these men go into the courtroom; (5) that Portas never stated that the gentlemen in the bathroom described or pointed out Landano and finally (6) that based on Portas' testimony, Portas was not certain that this gentlemen influenced him in his in-court identification of Landano. *Id.* at 228A.

As to the photo identification, the court concluded that "Mr. Portas without the slightest suggestion from any member of the prosecutor's staff selected Mr. Landano's photograph from one set of photographs and an accomplice's photograph from another set of pictures". *Id.* at 229A. The state court's opinion ignores or implicitly rejects Portas' testimony that he misidentified one of the dark-haired perpetrators depicted in the photo array prior to his tentative identification of Landano and further, that Portas would not have selected Landano's photo but for a *prior* suggestion by the prosecutor that "that's the man we want". However, given the inconsistencies in Portas' trial testimony and his testimony at the evidentiary hearing, this court must conclude that the state court's acceptance of Portas' trial description of the April 15, 1977 identification procedure implied a finding that Portas' subsequent testimony was not believable, and therefore undeserving of further analysis. *Id.* at 229A.

The court has reviewed the hearing and in particular the state's cross-examination of Portas. The court can well understand the state's interest in preserving a conviction once obtained, however that interest must be tempered by a respect for the rights and dignity of an impartial, law abiding individual who has come forward with evidence as a good citizen. In reading the transcript one could reasonably conclude that the witness had become the criminal. The examination was not a search for the

truth but rather an exercise in harassment and intimidation in an effort to dissuade the witness from any recantation. The court respectfully suggests that the prosecutor's role though continuing to be an advocate should demonstrate as much interest in obtaining exculpatory as well as incriminating information in this type of post-trial proceeding.

During the course of that proceeding Mr. Portas was reminded eleven times that his prior testimony had been under oath. He became concerned about a perjury charge. *See* Transcript of October 28, 1982 Hearing at 52–53. No one ever sought to dissuade him from that concern. As a result this court determined to conduct its own hearing, assuring Mr. Portas that he was free to reject his trial testimony if he was truthful in doing so.

The power to require an evidentiary hearing in a federal habeas corpus proceeding is vested in the "sound discretion" of the district judge. *See Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963). A district court may order a plenary hearing even though one is not obligatory. The court, in this instance, based its decision to conduct an independent hearing on several factors. First, recognizing the centrality of Portas' identification testimony to establishing petitioner as the driver of the getaway car and thus, by inference, the murderer, the court determined that it was appropriate to provide Portas with an uninhibited opportunity to proffer his recantation. Second, in light of newly discovered evidence raising a possibility that the photo Portas erroneously identified prior to selecting Landano, which according to Portas was subsequently removed, was that of Victor Forni, the court deemed it appropriate to confront Mr. Portas with a photograph of Forni.[5] Finally,

5. *See* May 12, 1987 Letter from Neil Mullin, counsel for Petitioner. On April 1, 1987 counsel for petitioner had an opportunity to review the Hudson County Prosecutor's files pursuant to an order of this court. Counsel discovered a document entitled "Property and Evidence Report" which reflects that on April 15, 1977, the day Portas was summoned to identify petitioner, two (2) photographs of Victor Forni were re-

moved from the prosecutor's vault for the apparent purpose of a photo array. Second, on April 15, 1987 counsel discovered a manila folder containing photos of Victor Forni which a Detective Michael D'Andrea suggested had been shown to a "truck driver" during the Landano investigation. It is on the basis of this circumstantial evidence that the court infers that Portas may have seen and identified a photo of

given the state court's failure to make specific findings as to Portas' inability to identify Landano from the array of dark-haired perpetrators absent prompting by the state, this court determined that an additional, more in-depth explanation of the circumstances surrounding this incident was warranted.

Accordingly, on September 2, 1987, this court conducted its own evidentiary hearing of Raymond Portas.[6] Having had an independent opportunity to observe Portas' demeanor on the stand and to assess his credibility as a witness, this court is convinced that Raymond Portas is a credible witness and further, that his recantation testimony is believeable. The court was struck by Mr. Portas' sincerity and candor. His testimony reflects a persistent effort to carefully recall, to the best of his ability, the events of 1976 and 1977 and a similar willingness to honestly admit those facts he was unable to remember. Moreover, Mr. Portas consistently testified that his uncertainty regarding the identification of petitioner was not the product of fading memory but rather had plagued him at the time of the trial itself. Portas reconfirmed his earlier recantation testimony that he had considered bringing his concerns to the judge's attention even before leaving the

courthouse on April 28, 1977, but that he had chosen the counsel of a priest instead whose advice had assuaged Portas' fears. Such contemporaneous misgivings enhance the credibility of Portas' testimony. Similarly, the fact that two photos from the S–2 array of dark-haired perpetrators were missing at trial and that no adequate explanation has been offered for their disappearance, further strengthens this court's finding as to Portas' believability.[7]

■ As a result of the September 2, 1987 hearing, this court finds the following facts: (1) Portas is unable to recall at this late date whether or not he was ever shown a photograph of Victor Forni, or whether he ever had occasion to see Victor Forni in person;

(2) Portas' in-court identification of the petitioner was tainted by the suggestive comments made to Portas in the bathroom immediately prior to his trial appearance.

(a) This court finds it reasonable to infer from Portas' testimony that the individual who approached Portas in the bathroom was a detective or other state agent. Only the state retained a substantial interest in securing Portas' identification. It is unlikely that any stranger to the case would have made such a statement.

---

Forni prior to his selection of the Landano photo.

**6.** Upon the suggestion of Neil Mullin, counsel for the petitioner, the court had also seen fit to call Mr. Frank Xavier, formerly employed as a detective by the Hudson County Prosecutor's office as a possible witness. Ex-detective Xavier had been responsible for supervising Portas' photo identification on April 15, 1977, the date here in question. It was this court's impression that Mr. Xavier might be able to expand upon testimony offered by Mr. Portas. However, on the morning of September 2, 1987 Mr. Xavier communicated to the court that he was unable to appear as he was severely understaffed and could not leave his retail business unattended. The court, finding that Mr. Xavier had established adequate cause pursuant to Federal Rule of Civil Procedure 45(f), excused his appearance that day. Upon the conclusion of Mr. Portas' testimony the court inquired of counsel whether they desired Mr. Xavier's appearance. Both defense counsel and counsel for the state declined the opportunity to call Mr. Xavier to the stand. In light of this waiver, Mr. Xavier was excused from any obligation to appear.

**7.** The state has attempted to provide the court with an explanation for these missing photographs. The state suggests that the missing photographs from the S–2 array were accidentally misfiled in the S–1 photo array. The state explains that the numerical markers on the top right hand corner of the S–2 array appear on the misfiled S–1 photos and that the numbers correspond to those missing from the S–2 folder.

The court finds this explanation implausible because even according to the state's own version, Raymond Portas was only shown the S–5 and S–2 photo arrays such that the prosecutor on April 15, 1977 could not have accidentally placed the S–2 photos in the S–1 folder. Second, the S–1 array was available to the state at trial and in fact, was presented to various witnesses but no error in numbering or sequence was detected at that time. It is on the basis of these facts that the court concludes that no adequate explanation has been offered for the disappearance of the S–2 photos.

(b) Further the court finds that the bathroom statement was "impermissibly suggestive" so as to create a "very substantial likelihood of irreparable misidentification". *See United States v. Sebetich,* 776 F.2d 412 (3d Cir.1985). Portas testified before this court that on April 28, 1977, only thirteen days after having been shown a photo of the petitioner and informed by the state that he was "our man", he was unable to recognize Landano as Landano passed him in the hallway. In addition, Portas testified that subsequent to the bathroom instruction identifying Landano as one of the two men, he was still unable to distinguish between Landano and defense counsel upon entry into the courtroom; and in fact, was only able to identify Landano as the defendant after his counsel introduced himself as such.

In light of this testimony, the court finds that on April 28, 1977, Raymond Portas lacked any "independent recollection" of the petitioner as the man he had seen driving the vehicle on August 13, 1976. *See United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).

■ (3) Finally, the court finds Portas' April 15, 1977 pre-trial identification of Landano to be suspect. In attempting to identify the dark-haired perpetrator from the S-2 photo array on April 15, 1977, Portas insists that he initially identified an individual other than the petitioner whose photo was then removed, and not reproduced by the state at trial. This information, denied by Detective Xavier, *see* Transcript of October 28, 1982 Hearing at 131, 143–44, was not available to the defense at trial and never presented to the jury. Finding Portas to be "credible" in his assertion, and finding that Portas' recital is corroborated by such circumstances as the unexplained missing photos from the S-2 array, and the suggestion by Hudson County Investigator Michael D'Andrea on April

4, 1987 that a manila folder containing Forni's photo had been shown to a "truck driver" during the Landano investigation but never produced at trial, this court is compelled to doubt the validity of Portas' pre-trial identification of the petitioner. *See* Certification of Neil Mullin, dated May 12, 1987; and Certification of Michael D'Andrea, dated June 1, 1987.[8]

In deciding which of two conflicting versions in this type of proceeding are credible, the court, whether it be the state or federal, may be usurping the function of the jury. If this conflict had been presented to the jury at the time of trial, the jury would have made the credibility judgment that has been made here. The test should not be which version the court believes, but whether the proferred testimony is sufficiently credible and reliable so that a reasonable jury might accept it as the truth. The fact that two judges have heard the same evidence and reached different conclusions as to its credibility indicates that a jury might well do the same.

■ However, having held its own evidentiary hearing and having had an opportunity to conduct independent fact finding, this court must now confront the difficult question of what legal significance it may attach to *its* findings. The mere fact that a district court exercises its discretion to conduct an independent hearing does not remove the statutory constraints upon the court's ability to rely on those findings absent adequate legal justification to reject existing, conflicting state court findings.

Section 28 U.S.C. § 2254(d) establishes a presumption of correctness for a "determination after a hearing on the merits of a factual issue, made by a state court of competent jurisdiction in a proceeding to which the applicant for the writ and the state or an agent or officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable

---

**8.** In his Certification of June 1, 1987, Mr. D'Andrea attempts to retract his original oral representation to petitioner's counsel that a manila folder containing photographs of Victor Forni was shown to a "truck driver" in connection with the Landano investigation. The court finds Mr. D'Andrea's effort to undermine the significance of his suggestion both implausible and inadequate to detract from the credibility of his spontaneous utterance. The court therefore rejects Mr. D'Andrea's post hoc efforts to deny previous representations that Portas had viewed the Forni photographs.

and adequate written indicia ...". In this instance the factual finding at issue is the state court's finding that Portas' recantation testimony was incredible and "untrustworthy". Determinations of credibility by a state court qualify as the type of "factual issue" to which the presumption of correctness generally attaches. "Issues of fact", as used in 28 U.S.C. § 2254(d), are "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators.'" *Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963) (quoting *Brown v. Allen*, 344 U.S. 443, 506, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953)).

Being required to extend the state court's credibility finding a "high measure of deference", *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), this court is necessarily precluded from substituting its own finding of Portas' credibility for the contrary finding reached by the state court. As the collateral facts relevant to petitioner's due process claim— whether or not Portas was able to identify petitioner's photo on April 15, 1977 and whether or not he had an independent recollection of the petitioner at the time of the in-court identification—require a threshold finding that Portas' recantation is credible, this court may not reach the merits of these issues unless it can overcome the presumption of correctness afforded the state court's credibility determination. In other words, petitioner's constitutional claim rests upon a determination that Portas identified someone other than Landano on April 15, 1977 and that this information was suppressed by the state, as was information concerning the bathroom coaching.

The prerequisite to rendering such a determination is a belief in the credibility of Portas' October 1982 testimony. If Portas' testimony as to these events is not credible, then there is no factual basis to support the constitutional claim. Therefore, if bound by the state court's credibility finding, this court lacks the authority to reach the constitutional issues framed in petitioner's application.[9]

The case law makes clear that a federal court in a habeas corpus proceeding may overcome the presumption of correctness only if one of the enumerated exceptions is applicable. *See* 28 U.S.C. § 2254(d)(1)–(8). Upon exhaustive consideration, this court is compelled to conclude that none of the deficiencies enumerated provides cause to set aside the state court's finding: (1) The state court did resolve the issue of whether Portas' testimony was believable as required under the standard for evaluating recantation testimony. (2) The factfinding procedure employed by the state court, though perhaps too lenient in permitting the prosecutor's abrasive treatment of the witness, was "adequate to afford a full and fair hearing". (3) A review of the proceeding reveals that Portas' was able to fully develop his testimony with the assistance of petitioner's counsel and that the state court had all the relevant information concerning Portas' recantation before it at the time it rendered its decision. Moreover, the court had the opportunity to observe Mr. Portas on two separate occasions providing adequate basis for a credibility determination. (4) The court properly exercised jurisdiction over petitioner's post-conviction application for a new trial. (5) Petitioner's rights were adequately protected

9. In petitioner's Sur Reply Brief, he argues that "[n]o state court has ever made findings or conclusions of law concerning the constitutional implications of the prosecutorial coaching that Raymond Portas received in the course of his photographic and in-court identification of the petitioner". Sur Reply Brief on Behalf of Petitioner at 8. It is beyond dispute that neither Judge Hanrahan nor the reviewing state apellate court reached the merits of petitioner's constitutional claims. However, this does not lead to the conclusion that this court is free, as a matter of law, to now resolve these constitutional questions.

The state court never reached the merits of these claims because it determined as a threshold factual matter that Portas' recantation testimony was "untrustworthy" and incredible. Such a finding obviated the need to conduct further legal analysis by essentially dismissing the factual basis upon which the constitutional claims were predicated. For this reason, if bound by the state court's credibility finding, this court is similarly precluded from reaching the merits of petitioner's claim with respect to Portas' identification testimony.

by the presence of his counsel who was free to conduct the direct examination of Mr. Portas, as well as proffer objections where appropriate. (6) Again, despite the court's own misgivings concerning the state's treatment of Mr. Portas, the number of times he was reminded that he had previously testified under oath, and the implicit threats of perjury charges, the court cannot conclude that petitioner's application did not receive a full, fair and adequate hearing. The case law illustrates that generally a federal court will set aside a state court finding on this basis only if the state court proceeding suffered from some gross procedural deficiency. *See Moore v. Kemp,* 809 F.2d 702 (11th Cir. 1987); *Davis v. Wyrick,* 766 F.2d 1197 (8th Cir.1985); *Griffin v. Wainwright,* 760 F.2d 1505 (11th Cir.1985). Where, as here, the applicant was represented by competent counsel, and was given unrestricted opportunity to examine the witness both on direct and re-direct examination as well as to object to cross-examination, this court would be acting outside the proper scope of the statute if it were to set aside the state court hearing on procedural due process grounds. (7) The applicant was not denied due process as a result of the state court proceeding.

Finally, (8) though this court may reach a different conclusion than did the state court, there is no legal basis for this court to hold that the state court's decision was not "fairly supported by the record". Particularly, where as here, the underlying "fact" is the determination of a witness' credibility, it would be impossible for this court to find, as a matter of law, that the court's subjective impression of the witness' demeanor, sincerity, manner of expression were not "fairly supported by the record". Furthermore, in light of the fact that Portas' testimony was contradicted in the record by that of Detective Xavier who testified that no photo other than petitioner's was selected from the S-2 array, the state court was entitled to weigh these competing recitations and choose between them. Though the opinion does not make this credibility choice explicit, it may be inferred that in disbelieving Portas, the court chose to believe Detective Xavier. Cf. *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1981).

The statute provides one additional alternative to the district court. 28 U.S.C. § 2254(d) permits a federal court to conduct an evidentiary hearing in a habeas proceeding even absent the existence of one of the enumerated exceptions but requires that "the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the state court was erroneous". The burden here placed upon petitioner is virtually insurmountable. The only evidence that could be presented to this court is the production of Raymond Portas himself. However, even having heard Portas' testimony and having found him to be credible, this court cannot conclude that the state court's contrary determination was erroneous. As stated previously, it is difficult to imagine the grounds upon which a credibility determination can ever be considered "erroneous". The subjective judgment implicated in a credibility determination is practically immune from the traditional "error" analysis. "Where there are two permissible views of evidence, the factfinder's choice between them cannot be clearly erroneous". *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

Moreover, the fact that a federal court would rule differently on the question of a witness' credibility is not sufficient to render the state court finding "erroneous". The Supreme Court has ruled that the high measure of deference that must be accorded adequately supported state court factual findings "requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations". *Marshall v. Lonberger,* 459 U.S. at 432, 103 S.Ct. at 849.

Similarly, in the context of Federal Rule of Civil Procedure 52(a), the Supreme Court has held that a federal appellate court, reviewing the findings of a district court pursuant to a "clearly erroneous" standard of review, is not entitled to "reverse the finding of the trier of fact simply because

it is convinced that it would have decided the case differently". *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). "A reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court". *Id.* In interpreting the Congressional intent underlying 28 U.S.C. § 2254, the Supreme Court has explained "[w]e greatly doubt that Congress ... intended to authorize broader federal review of state court credibility determinations than are authorized in appeals within the federal system itself". *Marshall v. Lonberger*, 459 U.S. at 435, 103 S.Ct. at 851.

Doctrines of comity and federalism constrain this court's ability to set aside the state court's finding. This court recognizes that 28 U.S.C. § 2254 does not permit a federal court to simply circumvent the presumption of correctness by holding an independent hearing and duplicating the state court's proceeding. To tolerate such judicial manipulation would make a mockery of the legislative policy underlying 28 U.S.C. § 2254. Although this court concluded that there was an appropriate basis to conduct a hearing for the reasons expressed above, judicial restraint requires this court to accord deference to the state court's findings.

Where the recantation testimony of a critical prosecution witness, if believed, raises substantial issues of constitutional import, requiring a federal court to be bound by the state court judge's credibility determination in every instance may undermine the petitioner's right to meaningful habeas review. The presumption of correctness embodied in Title 28 U.S.C. § 2254(d) operates to insulate a state court judge's credibility finding from subsequent federal analysis. Where, as here, the petitioner's most significant constitutional allegations are based on Portas' recantation testimony, the federal court should be able to conduct an independent hearing and substitute its credibility finding for that of the state court when the particular circumstances warrant. These circumstances are rare and will not result in gross deviations from the traditions of comity since such

independent hearings would only be permitted where the federal court determined that the witness in question played a critical role in securing petitioner's conviction. The recantation of cumulative evidence, where, for example, one of several eyewitnesses recants his or her identification, would not warrant an independent federal hearing. Further, a federal hearing would only be necessary where the recantation testimony, if believed, raises substantial questions of constitutional import.

Based on this court's independent hearing, if permitted to rely on its own finding of Portas' credibility the court would apply the federal standard for evaluating recantation testimony. In federal court, the impact of recanted testimony as a basis for a new trial motion depends both upon the credibility of the recanting witness and the materiality of his testimony. *See Mastrian v. McManus*, 554 F.2d 813, 823 (1977). This court finds Portas credible. Further the court finds that Portas' in-court identification should have been excluded on the grounds that the detective's coaching was unduly suggestive and infected Portas' ability to give accurate identification testimony; and that Portas had no independent basis for the in-court identification. In addition, if the jury was made aware that Portas had not been able to identify Landano's photo from the array of dark-haired perpetrators, this court is convinced that "the recanted testimony would probably produce an acquittal on retrial". *Id.* at 823.

It is for these reasons that the court believes an injustice results in requiring this court to abdicate its own fact finding authority and turn a deaf ear to petitioner's constitutional claims in deference to the state court's finding that Portas is an incredible witness. Yet, as a district court, this court is sworn to abide by the dictates of existing law and may not deliberately bypass explicit Congressional intent in substituting its judgment for that of the state court. It is for this reason though that the court urges the federal appellate court to reconsider the application of 28 U.S.C. § 2254 in similar circumstances. This

court has made every effort to elucidate upon the course it would have followed, if it were free to render its own fact finding. However, the ultimate authority to create a limited judicial exception to the application of § 2254 rests, if at all, with the court of appeals and not with this court.

For the reasons stated above, this court is compelled to deny petitioner's application for a writ of habeas corpus on this ground.

## II. *Allen Roller*

As a further ground for relief, petitioner alleges that the state violated the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by suppressing exculpatory and material evidence that would have impeached Alan Roller, the state's principal witness against the petitioner.

▆▆▆ In *Brady v. Maryland*, the Supreme Court held that a defendant's due process right to a fair trial is violated when the prosecution withholds evidence that is both favorable to the accused and "material either to guilt or punishment". 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985). Thus, under *Brady*, a prosecutor is required to disclose only that evidence favorable to the accused which, if suppressed, would deprive the defendant of a fair trial. *Carter v. Rafferty*, 826 F.2d 1299, 1304 (3d Cir.1987). "[U]nless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose."

*United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

The *Brady* rule has been extended to include impeachment evidence as well as exculpatory evidence. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). "Such evidence is 'evidence favorable to an accused' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *Cf. Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying that a defendant's life or liberty may depend").

At trial, Allen Roller, provided the state's principal evidence against the petitioner. Roller, an indicted co-defendant, admitted his participation in the crime and alleged that Landano had been his partner. *See* Trial Transcript for May 2, 1977, at 15. Further, Roller testified that Landano had admitted to having murdered Officer Snow.

▆▆▆ Roller testified at trial pursuant to a plea agreement entered into with the Hudson County Prosecutor's office. When questioned at trial concerning the terms of the plea agreement, Roller disclosed only that he had pled *non vult* to the charge of homicide and felony murder of Officer Snow in exchange for dismissal of all other counts of the indictment and a promised maximum sentence not to exceed thirty years. *See* Trial Transcript for May 2, 1977 at 91. Roller also stated that the Prosecutor had agreed to dismiss "another indictment, another charge of armed robbery" pending against him involving "Mike's Bar" in Jersey City. May 2, 1977 Transcript, at 91–92.[10] Roller alluded to no other pending charge.

---

**10.** When cross-examined as to the details of the "Mike's Bar" incident, Roller initially admitted that there were "three holdup men in that crime", but when asked to disclose the identities of his two co-defendants Roller refused to re-

veal one of their identities. *See* Trial Transcript of May 4, 1977, at 16–17. When charged by the court to respond to the question, Roller changed his testimony and maintained that only two men had been involved in the Jersey City hold-

In addition, Roller testified as to his criminal association with Victor Forni. Roller admitted that Forni had been involved in planning the Kearney robbery, and in fact, that Forni's gun had been used to kill Officer Snow. However, Roller denied that Forni played any role in the robbery itself. Similarly, Roller denied that he participated with Forni in other crimes.

Subsequent to the trial, evidence was disclosed implicating Allen Roller in armed robberies of the Perth Amboy Coin Exchange on September 26, 1975 and January 23, 1976 prior to trial. This evidence was made the subject of a new trial motion and remanded to the trial court for consideration. Hearings were held upon remand, and the state court rendered the following findings: (1) On August 27, 1976, a witness to the Perth Amboy crimes, Mr. Stepniak, was presented with photographs of suspects. Stepniak tentatively indentified Roller, Forni and Reen as the probable perpetrators of the first robbery, but he expressed some uncertainty. Detective Manuel Cruz also identified Allen Roller as one of the persons he observed outside the coin shop immediately prior to the first robbery.

(2) Detective Cruz contacted the Hudson County Prosecutor's office to arrange a line-up for witness Stepniak. As the result of ongoing extradition proceedings against Forni and Reen, a line up was postponed indefinitely. However, Detective Cruz recalls that Lieutenant Farley of the Hudson County Office, responsible for overseeing the Kearny investigation, requested that Cruz not publicize the Perth Amboy investigation "in order not to jeopardize any potential plea bargain". December 1, 1978 Opinion of Judge Walsh, Appendix, Volume I, at 33A.

(3) Though Thomas Mulcahy, the assistant prosecutor presenting the state's case against Landano, denied having any knowledge of the Perth Amboy investigation, the state court found that Lieutenant Farley's knowledge could be imputed to the prosecutor. *See Giglio v. United States*, 405

U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Reviewing these facts, the state court determined that the information concerning Roller's participation in the Perth Amboy robberies was properly "exculpatory" evidence within the meaning of *Brady*. Walsh Opinion at 36A. Specifically, the court held that the suppressed evidence, if allowed at trial "would have been probative in demonstrating, if Roller denied Forni's participation in Perth Amboy, that Roller was protecting Forni". *Id*. Further, the state court found that the evidence would serve to impeach Roller "by tending to show Roller's interest in testifying favorably in order to minimize the potential consequences of a prosecution for these crimes". *Id.* at 37A.

Having made these findings however, the state court concluded that the withheld evidence was not "material", namely that there was not a reasonable probability that had the supressed evidence been disclosed, the outcome of the trial would have been different. The Third Circuit has recently ruled that "the materiality of evidence under *Brady* is a mixed question of law and fact and that state court determinations of the law portions of this mixture are not entitled to a presumption of correctness under Section 2254(d)". *Carter v. Rafferty*, 826 F.2d 1299, 1306 (3d Cir.1987). Accordingly, this court need not defer to the state court's legal conclusion that the suppressed evidence is not material but rather must undertake an independent legal analysis.

In order to determine the "materiality" of this evidence the court must consider "the strength or fragility of the state's case against [Landano] as a whole". *Id.* at 1308. As noted by the Supreme Court in *United States v. Agurs*, "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of minor importance might be sufficient ..."

up. The jury was able to infer that Roller was

protecting someone.

427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976).

At the outset, the court notes that had the suppressed information merely provided evidence of Roller's additional criminal activities, such evidence alone would not be sufficient to undermine confidence in the outcome of the trial. First, Roller's criminal record was already disclosed to the jury such that evidence of additional criminal activity would not serve to seriously impugn Roller's testimony. Second, while evidence that Roller had lied as to the extent of his criminal activities would certainly impeach Roller's credibility, such cumulative evidence standing alone would not suggest a motive for Roller's identification of Landano, nor would it establish additional bias or interest on Roller's part. Roller's interest in testifying favorably was previously established in the record through testimony regarding his guilty plea agreement.

However, the information establishing a criminal partnership between Roller and Forni, evidenced by their joint participation in the Perth Amboy robberies, gives the court greater pause. Though recognizing that the only evidence linking Forni to the Perth Amboy crime was Stepniak's tentative photo identification, the court believes that had defense counsel had the opportunity to present the jury with such evidence, counsel might have convinced the jury that Roller and Forni operated as a team.

The Perth Amboy robbery was similar in kind to the Kearny robbery. Evidence that Forni and Roller were partners in this criminal venture would have permitted counsel an opportunity to effectively argue that they were partners in the Kearney incident as well. It is undisputed that the gun used to kill Officer Snow was Forni's and that Forni was involved in the planning stage of the Kearny robbery. Moreover, the description of the dark haired perpetrator offered by eyewitnees Joseph Pasciutti closely matched Forni's physical appearance.

At trial Roller denied having participated in criminal activity with Forni. Presentation of the Perth Amboy evidence would challenge Roller's credibility on this issue and create a powerful suggestion that Roller was lying to protect Forni.

If this additional evidence were considered absent Raymond Portas' independent identification of Landano as the driver of the getaway car, the court would unhesitatingly find that the information concerning the Perth Amboy robberies was material. However, considering the additional information in light of Portas' photographic and in-court identification of the petitioner, the court cannot conclude that there is a reasonable probability that the outcome would have been different. In light of the other evidence, this court is compelled to conclude that petitioner was not denied a fair trial as a result of the state's suppression of the evidence concerning the Perth Amboy robberies.

### III. *The Investigation of Jacob Roth*

■ As a further basis for relief, petitioner asserts that the state of New Jersey violated the requirements of *Brady v. Maryland,* by failing to disclose information concerning an investigation into the potential "loan sharking" and money laundering activities of the Roth check cashing facility, its suspected connections to "underworld" figures and the possibility of illegal payment of gratuities to the decedent, Officer John Snow. Petitioner argues that such information might have been used to impeach Jacob Roth's testimony by showing bias or interest. *See* Petitioner's Brief at 45.

On July 21, 1981, assistant prosecutor Thomas Mulcahy, responsible for having presented the state's case against petitioner four years earlier, addressed an audience at Kean College on the topic of the Landano trial. *See* Transcript of Mulcahy Lecture, Exhibit A attached to May 27, 1986 Mullin Affidavit. His remarks revealed for the first time that during the pendency of the criminal investigation resulting in petitioner's indictment and trial, a simultaneous investigation was being conducted into the business dealings of Jacob Roth, victim of the Kearny robbery, and one of two witnesses who positively

identified petitioner as the dark-haired perpetrator. Mr. Mulcahy's presentation disclosed that the Hudson County Prosecutor's Office had "looked hard" into the Roth check cashing operation suspecting that "these kinds of check cashing operations many times have contacts with the underworld in a sense that they are very convenient since there is so much money being transferred—it's a very convenient place to have a loan sharking operation of ... a sort. *See* Exhibit A at 233a. Particular suspicion had been aroused with regard to the Roth facility because Roth "also happened to have a place in Elizabeth that he had sold", which Mulcahy believed was a joint venture affiliating Roth with a notorious Bayonne "loan shark" identified as Gallagher. *See* Exhibit A at 233a; *see also* Israel Affidavit, ¶ 12 attached to Petition as Exhibit C; *see generally* Lotwis Affidavit, attached to Petition as Exhibit D.

Mulcahy's remarks fairly support an inference that Roth was aware of the ongoing investigation into his business dealings. Mulcahy explained that Roth was subjected to "numerous interviews" throughout the investigation, Exhbit A at 235a, and that these interviews probed not only Roth's "underworld" connections but also possible improprieties in his relationship with the murdered officer, John Snow. Specifically Mulcahy recalled that "throughout the investigation and in numerous interviews, we [the Hudson County Prosecutor's Office] asked Mr. Roth whether he ever gave any moneys as a gratuity to Mr.—Police Officer Snow who was killed.... They never admitted to us that there was ever any monies exchanged, although I always suspected there was". Exhibit A at 235a.

Perhaps most significantly, Mulcahy disclosed for the first time during this presentation that Jacob Roth "was a somewhat uncooperative guy who never wanted to be—didn't want to be bothered". Exhibit A at 288a. According to Mulcahy, Roth "just didn't want to be involved and we had to like coerce him—tell him—you're involved—this is your place—it got ripped off." *Id.*

The significance of Mulcahy's post-trial disclosure may best be understood in context. At trial, Jacob Roth, victim of the Kearny robbery took the stand and offered testimony against the petitioner. Though Roth's recollection of the events contradicted those of Roller and of his son Jonathan Roth, Jacob Roth testified that petitioner and not Roller had approached the check cashing facility on the day of the crime. Roth rendered an in-court identification of petitioner and testified that prior to his court appearance he had twice "positively" identified petitioner's photo when shown a photographic array. Contrary to Roth's testimony, Detectives Zarnowski, Thompson and Hanson described Roth's initial photo identification on August 26, 1976 as "tentative", but that Roth had been able to positively identify the petitioner from photo array S–2 on August 31, 1976. Roth maintained that each of the two identifications had been "positive". *See* Trial Transcript, April 27, 1977, at 21.

When petitioner took the stand at trial the prosecutor inquired of him: "is there any reason you know of that Mr. Roth would have come in here and point you out as the man he saw from his window on August 13?". *See* Trial Transcript, May 10, 1977 at 81–82. Petitioner could offer no explanation.

Finally, the prosecutor's summation emphasized to the jury that "throughout this case there is no suggestion of police malpractice or coercion on these [photographic] selections." *See* Trial Transcript, May 11, 1977, at 95–96.

Petitioner now comes before this court arguing that the information concerning the state's investigation of Roth, previously suppressed, is both exculpatory and material under the rule in *Brady* and provides a sufficient basis for vacating petitioner's conviction. Petitioner argues that the mere fact of the investigation is sufficient to establish bias and therefore qualifies as exculpatory evidence. Relying on the court's reasoning in *State v. Mazur*, 158 N.J.Super. 89, 385 A.2d 878 (App.Div.1978), *cert. den.* 78 N.J. 399, 396 A.2d 586 (1978), petitioner asserts that even though no for-

mal charges were pressed against Roth, the investigation's coercive effect was substantial in light of a New Jersey statute which provides that the state may refuse to renew a check cashier's license if he is "associating or consorting with any person who had, or persons who have, been convicted of a crime or crimes in any jurisdiction". *N.J.S.A.* 17:15A–12. Arguing that the investigation was "livelihood threatening" and had a bearing on Roth's future licensing, petitioner urges this court to conclude that had the jury known of the investigation they could have inferred that Roth had an interest in accomodating the prosecution and further could have ascribed a motive to Roth's willingness to mischaracterize his tentative identification of Landano as "positive".

This court is inclined to agree that the information concerning Mulcahy's investigation into Roth's business dealings is exculpatory and if used effectively might have so undermined the jury's assessment of Roth's credibility as to alter their deliberative consideration of his identification testimony. Though the contradictions between Roth's testimony and that of other witnesses were readily apparent to the jury at trial, disclosure of this information would have provided the jury with a possible explanation for Roth's deviation. The court finds the state's contention that counsel for petitioner was free to cross-examine Roth "on any subject, including any possible organized crime connections to his check cashing operation" both insincere and implausible. *See* State's Brief in Opposition at 23. The state's knowing suppression of its investigation cannot be excused by asserting that counsel for petitioner might have been able to "fish" out some possible interest or bias on Roth's part through cross-examination.

Moreover, the court rejects the state's argument that Mulcahy's July 1981 comments are not a proper basis for establishing the existence of a contemporaneous investigation of Roth's business dealings. The court finds no basis in law or reason to support the state suggestion that petitioner bears the burden for providing affidavits from Mulcahy and Roth to substantiate the veracity of Mulcahy's comments. *See* State's Reply Brief at 5. On the contrary, petitioner is entitled to rely on information provided by the state prosecutor and the burden falls to the state to convince the court that these comments are not accurate. Finding that the state has made no effort to submit an affidavit by Mr. Mulcahy denying the details of the Roth investigation the court finds that the state impliedly admits the authenticity and veracity of the Mulcahy comments.

What remains however is for this court to determine whether evidence regarding the Roth investigation satisfies the *Brady* materiality standard. In rendering its decision the court must take into account that Roth was the only state witness present at the crime scene who was able to "positively" identify Landano. In addition, the court recognizes that the jury struggled with this action and in fact, appeared deadlocked after two days of deliberation.

Yet, upon review of the record, this court is compelled to conclude that even were the jury to discredit Roth's testimony in its' entirety, there is no reasonable probability that the outcome of the trial would have been different. The court bases its decision on the following factors: The strongest evidence presented against the petitioner at trial was the testimony of co-defendant Allen Roller. Roller's trial testimony contradicted Roth's testimony with respect to petitioner's role in the commission of the crime. As Roller's testimony was confirmed both by the description of eyewitness Pasciutti, who testified that the dark-haired perpetrator did not approach the check cashing facility but rather approached Officer Snow's vehicle, and by the testimony of Raymond Portas who was able to affirmatively identify petitioner as the driver of the getaway car, the court must conclude that the jury was persuaded by this testimony and relied on it in reaching their verdict of conviction. The subtraction of Roth's testimony does not detract from the weight of this evidence. It is for this reason that the court concludes that exclusion of this evidence would not create a sufficient probability of acquittal.

## IV. *The Allen Charge*

 As the final ground for relief petitioner alleges that the trial court improperly interfered with the jury's prerogative to return no verdict by issuing a "coercive" *Allen* charge in violation of petitioner's Sixth Amendment and due process rights.

In *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the Supreme Court sanctioned use of a supplemental jury charge instructing a deadlocked jury to resume deliberations with "a proper regard and deference to the opinions of each other" and to "listen, with a disposition to be convinced, to each other's arguments", and thus "to decide the case if they could conscientiously do so". *Id.* at 501, 17 S.Ct. at 157. While the Supreme Court's holding in *Allen* remains the controlling law, use of the *Allen* charge has been severely criticized.

In 1980, the New Jersey Supreme Court in *State v. Czachor*, 82 N.J. 392, 413 A.2d 593, exercised its supervisory power to hold that use of "a charge containing coercive features should not be given to a jury in the trial of a criminal case." 82 N.J. at 402, 413 A.2d 593. The court reasoned that the "*Allen* charge conveys both blunt and subtle pressure upon the jury, pressure which is inconsistent with jury freedom and responsibility". *Id.* *Czachor* was given limited retroactive effect, and the Appellate Division upon review of petitioner's post-conviction relief application determined that petitioner's action was properly within the scope of *Czachor's* limited retroactivity. *See* Opinion of the Appellate Division, January 30, 1984, Appendix, Volume I at 240A.

However, the *Czachor* court made clear that "[t]here will undoubtedly be some appeals coming within the rule of limited retroactivity in which all or the most objectionable characteristics of the typical *Allen* charge will not be present. In such instances, it would be appropriate for the appellate court to review the surrounding circumstances in order to decide whether there was sufficient potential for coercion to justify reversal". 82 N.J. at 410, 413 A.2d 593.

The Third Circuit in *United States v. Fioravanti*, 412 F.2d 407 (3d Cir.1969) *cert. denied* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969), provides the appropriate standard. *Fioravanti*, like *Czachor*, condemned the *Allen* charge as an unwarranted judicial invasion of the exclusive province of the jury. The court reasoned that "[t]he possibility of a hung jury is as much a part of our jury unanimity schema as are verdicts of guilty or not guilty. And although dictates of sound judicial administration tend to encourage the rendition of verdicts rather than suffer the experience of hung juries, nevertheless, it is a cardinal principle of law that a trial judge may not coerce a jury to the extent of demanding that they return a verdict". *Id.* at 416. Further, *Fioravanti* challenged the premises upon which the *Allen* charge is based, namely (1) that the minority should reexamine their own convictions in light of the majority's viewpoint and (2) that individual jurors should sacrifice their reasonable doubts in order to achieve unanimity.

While in *Fioravanti*, the Third Circuit exercised its supervisory power to preclude use of the *Allen* charge within this circuit, the court's ruling cannot render use of an *Allen* charge by a state court presumptively unconstitutional. *Id.* at 419–20. However, pursuant to *Fioravanti*, a petitioner must demonstrate that the *Allen* charge and the context in which it was presented was so prejudicial as to deprive the petitioner of a fair trial and a unanimous verdict based on proof beyond a reasonable doubt. *Id.* at 419. Applying this standard to the facts at hand, this court cannot conclude that the charge given was unduly coercive and therefore denies relief on this basis.

After approximately two days of deliberation and an intervening week-end, the jury informed the court as follows:

"Your honor, we honestly feel we cannot get a twelve vote count on guilty or not guilty. We tried on all eight counts. We can't say twelve to zero guilty or not guilty. What shall we do?"

The court responded by delivering an *Allen* charge, instructing the jurors to resume

their deliberations. The full text of the court's instruction appears at pages 2 through 4 of the Trial Transcript from May 17, 1977. Petitioner objects to the following portions of the instruction:

(1) the judge emphasized the time and expense involved in trying petitioner remarking ".. we are in the fifth week of this trial. And I think you realize what is invested as far as time, money and everything else."

(2) the judge instructed the court that "this case at a future time must be decided" and that "[t]here's no reason to suppose that the case will ever be submitted to twelve persons more intelligent, more impartial or more competent to decide it; or that more or clearer evidence will ever be produced on one side or the other".

While the court agrees that it was unnecessary, and in fact, inaccurate to instruct the jury that this case "must be decided", when considered in context, this court cannot find that the instruction was so coercive as to have deprived petitioner of a fair trial and the right to a unanimous jury.

In the course of its instruction, the trial court made clear to the jurors that they had "a duty to reach a verdict", but then immediately added "if that's possible". The court was careful to explain that it had "neither the power nor the desire to compel an agreement upon a verdict". In asking the jurors to resume their deliberations, the court emphasized "the importance and desirability of reaching a verdict, provided, however, that you as individual jurors can do so without surrendering or sacrificing your conscientious scruples or personal convictions".

Read as a whole, the instruction is a forceful effort to encourage further deliberation. Nevertheless, it does not request the minority to succumb to the majority viewpoint, nor does it ask that individual uncertainty be sacrificed to achieve unanimity. In fact, the trial judge was careful to remind the jurors that it would, and could not compel a verdict and that no individual should surrender his or her own scruples. By admitting that it lacked the power to compel an agreement upon a ver-

dict, the court conveyed to the jury a definite impression that it was *not* demanding a verdict.

Other courts have ruled that an instruction informing a jury that a case "must be decided" violated the Sixth Amendment by denying the jury's preprogative to return no verdict. However, in this case, the offending charge that this case must be decided followed a thorough and careful explanation by the court that it might not be possible to reach a verdict, that the court lacked the power to compel a verdict and that no individual juror was required to sacrifice his or her beliefs in order to reach agreement. Considered in this context, the language was not sufficiently forceful to "coerce" the verdict, nor did it mislead the jury into believing that they could not return no verdict. As the questionable language was tempered by an appropriate, albeit forceful invitation to undertake further diligent deliberative efforts, the court finds that the trial court did not violate petitioner's Sixth Amendment right in delivering this instruction.

CONCLUSION

The failure to grant the writ predicated upon the Portas recantation infects the remaining grounds as well. The conviction would clearly fall but for the resurrection of Portas' trial identification testimony. Without it, even the other grounds would provide independent bases for relief and certainly in the aggregate, they would be sufficient to undermine confidence in the trial's outcome.

No decision of this court has ever been made with greater reluctance. In the current debate over judicial restraint and judicial activism, one tends to forget that individuals as well as concepts and principles are involved. Upholding deference to state factual findings in this matter is a bitter exercise of judicial restraint, since it may result in a gross injustice.

ORDER

This matter having been opened to the court upon the application of petitioner, Vincent James Landano, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, and this court having heard oral argument

and having considered the written submissions of all parties, and for the reasons set forth in the accompanying opinion filed this day,

IT IS this 29 day of September, 1987 hereby

ORDERED that petitioner's application for a writ of habeas corpus is denied; however, it is further

DETERMINED that there is probable and significant cause for appeal.