THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. .ANTHONY M. PUCHALSKI, DEFENDANT-APPELLANT

Argued March 1, 1965—Decided June 14, 1965.

*Mr. Ronald J. Picinich,* Assistant Prosecutor, argued the cause for respondent (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney; *Mr. Ronald J. Picinich,* Assistant Prosecutor, on the brief).

*Mr. Joseph Guez* argued the cause for appellant.

The opinion of the court was delivered by

HANEMAN, J. Defendant appeals from a conviction of murder in the second degree. *R. R.* 1:2–1(c). The pertinent facts, as developed at the trial, are as follows:

Defendant, together with George Allen, Bruno Gussie and Warren DeFrazio, robbed a home in Jersey City on April 18, 1962. Without its being known by the other three, Gussie, the last to leave the house, pistol-whipped and raped the wife

of the owner. Defendant, upon learning of the rape on the following day, became quite incensed. When Gussie called defendant and advised him that he [Gussie] was wanted for questioning in connection with the robbery, defendant suggested that he surrender and have his wife prepare an alibi for him. Later the same day Gussie told the defendant that his wife had refused, and demanded money from him to enable him to flee. He emphasized the latter by stating: "And if they do pick me up, just how long do you expect me to last, a man can just take so much."

Shortly after this conversation the defendant contacted Allen and the two of them, using the ruse that they were planning another robbery that night, met Gussie at 8:30 P.M. Defendant, who at Allen's suggestion had purchased gloves so that a parafin test would not later disclose powder grains, had a loaded automatic pistol under the front seat of the car. Allen drove the car containing the three to a parking lot in Ridgefield Park, Bergen County. Defendant and Gussie got out of the car. Defendant shot him in the back of the neck and killed him.

The proofs offered by the State were: (1) defendant's two written statements and various oral admissions; (2) Allen's testimony, to the effect that Gussie had to be silenced to keep him from talking, and that since the defendant had invited Gussie to participate in the robbery he felt responsible for his going "sour"; and (3) circumstantial evidence corroborating the confession and negating the anticipated defense of an accidental killing or killing in self-defense.

After defendant's conviction Allen pleaded guilty to an accusation of aiding and assisting Puchalski to escape apprehension for murder, and the outstanding murder indictment against him for Gussie's death was dismissed. He was sentenced on that accusation to a term of two to three years, and was later tried and convicted for his participation in the armed robbery. On that charge he was sentenced to a term of from five to seven years. While at State Prison, where defendant was also incarcerated, Allen signed a recanting

affidavit dated February 9, 1963, wherein he repudiated his trial testimony as the product of fear for his own life and the prosecutor's harassment. In this affidavit he substantiated defendant's version of the killing (*i.e.*, that it was accidental).

Defendant's counsel took no further action in connection with Allen's recantation until March 1964, when, during the pendency of this appeal, he moved this Court for a remand to permit a motion for a new trial based on this post-trial recantation by the State's key trial witness against his client. This Court granted the motion and the trial judge promptly held a hearing thereon. Allen, when called to testify at that hearing, neither affirmed nor denied signing the recanting affidavit. He apparently had a complete memory failure, testifying that he could not remember the actual killing or anything he had stated at trial or in his recanting affidavit. The trial judge denied the motion for a new trial.

Defendant now advances a two-pronged attack upon his conviction. He argues that (1) his confession was involuntary, and (2) the motion for a new trial should have been granted. We shall consider his arguments in that order.

I.

Defendant argues that his will was overborne, his capacity for self-determination critically impaired, and that his confession was obtained by such fundamentally unfair means as to require the conclusion that it was involuntary. See *Culombe v. Connecticut*, 367 *U. S.* 568, 602, 81 *S. Ct.* 1860, 6 *L. Ed. 2d* 1037, 1057–1058 (1961); *State v. Naglee*, 44 *N. J.* 209, 218 (1965); *State v. Wade*, 40 *N. J.* 27, 35 (1963), *cert.* denied 375 *U. S.* 846, 84 *S. Ct.* 100, 11 *L. Ed. 2d* 73 (1963). In that connection he asserts that from 6 P.M. on April 23 (when he was picked up for questioning) to 4:30 A.M. on April 27 (a period of some 82 hours) he was under almost constant interrogation, with little or no sleep or food, was physically abused and threatened, and was isolated from counsel and friends.

 In determining the issue of voluntariness, our courts have recognized that the same must be decided upon the facts involved in each individual case. *State v. Petrolia*, 21 *N. J.* 453, 459 (1956), *cert.* denied 355 *U. S.* 942, 78 *S. Ct.* 431, 2 *L. Ed. 2d* 422 (1958); *State v. Tune*, 13 *N. J.* 203, 215 (1953), *cert.* denied 349 *U. S.* 907, 75 *S. Ct.* 584, 99 *L. Ed.* 1243 (1955); *State v. Pierce*, 4 *N. J.* 252, 258 (1950). In addition to the length of time the defendant has been detained, the court should consider such other relevant circumstances as how the time has been utilized, *State v. Smith*, 32 *N. J.* 501, 555 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961); the age, intelligence and experience of the defendant, *State v. Loray*, 41 *N. J.* 131, 136 (1963); *State v. Smith, supra*; whether the defendant has been legally detained, *State v. Jackson*, 43 *N. J.* 148, 169 (1964); whether the defendant has been warned that the confession may be used against him, *State v. Reynolds*, 41 *N. J.* 163, 180 (1963), *cert.* denied 377 *U. S.* 1000, 84 *S. Ct.* 1934, 12 *L. Ed. 2d* 1050 (1964); *State v. Scanlon*, 84 *N. J. Super.* 427, 438 (*App. Div.* 1964); the defendant's prior experience with the law; and whether the defendant complained to the magistrate before whom he was arraigned, *State v. LaPierre*, 39 *N. J.* 156, 169 (1963), *cert.* denied *Bisignano v. New Jersey*, 374 *U. S.* 852, 83 *S. Ct.* 1920, 10 *L. Ed. 2d* 1073 (1963). In other words, we must consider both the characteristics of the particular defendant and the pressure brought to bear on him.

Defendant contends that the State's own proofs show that he was questioned for some 39½ hours during the 82-hour period between his arrest and his stenographic confession, to wit: all Monday night (April 23), Tuesday evening for two hours, all day Wednesday and all day Thursday into the early hours of Friday (April 27). The defendant's brief maintains that the length and intensity of Puchalski's questioning were comparable to that experienced by defendants Watts, Turner, Harris and Culombe, all of whose confessions were held to be coerced. *Watts v. State of Indiana*, 338 *U. S.* 49, 69 *S. Ct.*

1347, 93 *L. Ed.* 1801 (1949) ; *Turner v. Commonwealth of Pennsylvania,* 338 *U. S.* 62, 69 *S. Ct.* 1352, 93 *L. Ed.* 1810 (1949) ; *Harris v. State of South Carolina,* 338 *U. S.* 68, 69 *S. Ct.* 1354, 93 *L. Ed.* 1815 (1949) ; *Culombe v. Connecticut, supra.* Although Puchalski was questioned over a period of three and one-half days, his questioning was not in "relays" as was that of *Watts* and *Harris,* he was not kept incommunicado as *Watts, Harris* and *Turner* were, and he was a much stronger individual than *Culombe,* an illiterate mental defective of the moron class.

In connection with the question of the voluntariness of Puchalski's confession and his allegations that his will was overborne, it must be remembered that he was 28 years of age at the time here involved; he had completed his high school education and had studied some business law; his testimony is lucid and his use of English is excellent; nor was he unfamiliar with criminal proceedings, having been convicted in New York State of burglary, in Jersey City of breaking and entering, and in Newark of attempted larceny.

The State adduced the following testimony: Defendant was picked up for questioning at 6 :00 or 6 :30 P. M. on Monday, April 23. He was taken to the Union City police station and from there transferred to the Jersey City Fifth Precinct Building at 8 :00 P. M. He was asked whether he wanted counsel and replied that his lawyer was a "Counsellor Liebman." When the police inquired whether he desired them to contact Mr. Liebman he responded in the negative, explaining that his sister would take care of that. He was questioned intermittently, principally about the robbery-rape, until about midnight, when he was asked if he wished to see his sister. Having received an affirmative answer, the police sent a car to bring her to the precinct station. He had a private conversation with her for about 20 minutes. The questioning then continued until about 3 :00 A. M., when he agreed to give an alibi statement. The police then finger-printed and photographed him. At 8 :05 A. M. he was transferred to the Jersey City Prison where he remained, without being further ques-

tioned, until later that morning when he was taken before a magistrate and held as a material witness in the robbery-rape investigation. He was returned to the City Prison at about noon and at 5:15 P. M. was taken to the Detective Bureau for questioning by the Bergen County police in connection with the Gussie murder. This questioning lasted about two hours, after which time the records of the prison indicate that he was returned to his cell and was not disturbed from 7:30 P. M. until 10:30 the following morning (April 25). At that time he was taken to the Fifth Precinct Building to be more readily available for questioning as the investigation proceeded. During his sojourn at the Fifth Precinct he asked permission to speak to his parole officer and the prosecutor of Hudson County. Both requests were granted and he had a conference with an assistant prosecutor and the parole officer, the meeting with the latter being in private and lasting approximately 15 minutes. He remained there all day and was returned to City Prison at 7:25 that evening. He again spent an uninterrupted night, and at 10:30 A. M. (April 26) was returned to the Fifth Precinct. During both days the proofs indicate that the questioning was intermittent and sporadic; the police would run down leads and then question the defendant in relation thereto.

Shortly before 8:00 on Thursday evening, after having finished a roast beef dinner, and while engaged in general conversation with a sergeant who had no connection with the investigation of either crime, he suddenly indicated a desire to confess. That his ensuing statements were precipitated by a feeling of remorse at his crime and not as a result of continuous and unrelenting police interrogation which overbore his will to resist is exemplified by his statement to the sergeant: "You just can't do it, you just can't keep something like this in, you have to get it out sometime or other." The only promise made to defendant when he volunteered to confess was that he could speak to his sister before the confession was released to the newspapers.

104

The Jersey City police proceeded to take two statements from him. The first concerned the robbery-rape case. He was warned at the outset of his constitutional right to remain silent. It took from 10:30 P. M. to approximately 1:00 A. M. to complete this statement because no stenographer was available and a police officer had to do the typing. Thereafter they took a coffee break, and the defendant began to give a statement to the Jersey City police about the Gussie murder in Bergen County. His statement was reduced to writing by 4:00 A. M. Both he and the captain of the Jersey City police initialed each page, the defendant even going so far as to correct some misspellings. He was then permitted to see his sister, and they had a 15-minute private conversation in one corner of the room. She was overheard at one point to say, "Oh, no. Please, no, don't tell me that." Defendant replied, "I want to get it off my chest." At about 5:30 A. M. the Bergen County authorities arrived with an official court reporter. The statement here in issue was then taken. Defendant was again warned that he did not have to answer any questions. The questioning did not consist of a long statement by the police, followed by a simple "yes" or "no" answer. On the contrary, he narrated events of the fatal evening and at one point talked uninterruptedly for two pages. After reciting the details of the murder he said, "Oh God, Oh Lord, forgive me." He cried several times while making the statement.

The defendant, on the other hand, gave a totally different version of his three and a half day detention. He testified that he had not been permitted to sleep and had nothing to eat during the entire 82-hour period; he had been beaten and slapped by four police officers in relays; and that by the night of April 26 (when he confessed) he was semi-conscious and had no recollection of the events that transpired. His sister testified that when she saw him at about 4:00 A. M. on April 27 he could only mumble incoherent words. She also testified that despite various requests to the police she had been refused permission to see her brother between his arrest on Monday and his confession on Friday morning.

■ The trial judge, after a fairly extensive review of the testimony on behalf of both the State and the defendant, found the defendant's version unbelievable and ruled that the confession was voluntarily given. We concur in that finding. Contrary to defendant's recital of the pertinent events, we are satisfied that the questioning was intermittent and sporadic during the entire period covered, with frequent interruptions to permit the police to check defendant's alibi and to continue their investigation. He was not questioned at all between approximately 7:00 P. M. and 11 A. M. on both Tuesday and Wednesday nights. He was fed three meals a day during the entire period and allowed 15 hours for rest and sleep on Tuesday and Wednesday nights. The record substantiates the fact that the actual time spent questioning the defendant by police officers, prior to 8 o'clock on Thursday evening when he first evidenced a willingness to confess, covered somewhere between $4\frac{1}{2}$ and 10 hours over the 74-hour period. He was not held incommunicado. Further, during the first questioning by the police he was asked by a captain of the department whether he desired them to contact a lawyer. He refused the offer. He was permitted, at his request, to confer in private with his sister, his parole officer, and an assistant prosecutor of Hudson County. He was warned several times of his constitutional right to remain silent, and that anything he said could be used against him. The statement herein admitted in evidence was given after defendant had a conference with his sister. He made no complaint of the allegedly inhumane police treatment to the magistrate at the arraignment or to anyone else.

Based on a careful perusal of the record the conclusion is inescapable that Puchalski's story of 82 hours of beatings and deprivation of food and sleep should be rejected as incredible and unfounded in fact. The very transcript of his confession demands a conclusion that his mind was clear and that his will was not overborne. His conduct and the statements themselves bear the earmarks of a man finally stricken with remorse and suffering an emotional upset at the enormity of his

crime, rather than the actions of a man whose will was overborne by beatings, starvation and denial of rest for three and one-half days and nights.

As previously noted, the defendant was picked up on April 23 for questioning. On April 24 he was charged before a magistrate with being a material witness to the Hudson County offenses (robbery-rape) and placed under $20,000 bail. *N. J. S.* 2A:162–2 and 3. In default thereof he was committed to the Jersey City Prison. While defendant now challenges the probable cause of his arrest (it being effectuated without a warrant) and further challenges the procedure under which he alleges he was detained on the pretense of being a material witness, while in reality he was the one under suspicion, these questions were not raised at trial. Consequently, no proof was adduced on either subject, and we cannot pass upon either contention as the record is void of facts upon which to base a conclusion. In any event, while an arrest without probable cause and an unlawful detention are factors to be considered on the issue of the voluntariness of a confession, they are not determinative, *State v. Jackson, supra,* 43 *N. J.,* at *pp.* 167–169, and do not warrant such a conclusion under the facts herein.

The question of the voluntariness of a statement is not solvable by any mathematical formula. It is to be answered by a consideration of the facts and circumstances of each case. Here we are satisfied from an independent examination of the record that the trial judge and the jury were well justified in concluding that defendant's will was not overborne; that the confessions were made freely and voluntarily without compulsion or inducement; and that there was an observance of fundamental fairness in the proceedings which precipitated the confessions.

## II.

Defendant also contends that the trial court erroneously denied his motion for a new trial based upon Allen's recantation of his trial testimony.

The guidelines for the consideration of such an application are stated in *State v. Artis,* 36 *N. J.* 538, at *p.* 541 (1962), as follows:

> "A motion for a new trial is addressed to the sound discretion of the trial court, and its determination will not be reversed on appeal unless there has been a clear abuse of that discretion. *State v. Smith,* 29 *N. J.* 561, 573 (1959). To entitle a party to a new trial on the ground of newly discovered evidence, the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the original trial and not discoverable by reasonable diligence prior thereto; and (3) of the sort which would probably change the jury's verdict if a new trial was granted. *State v. Johnson,* 34 *N. J.* 212, 222 (1961); *State v. Bunk,* 4 *N. J.* 482, 486 (1950). To sustain a motion for a new trial the proffered evidence must meet all three aspects of the test. *State v. Johnson, supra,* 34 *N. J.,* at *p.* 223."

See also *State v. Sullivan,* 43 *N. J.* 209, 232–233 (1964). In addition to the above criteria, this Court said in *State v. Vaszorich,* 13 *N. J.* 99, at *p.* 130 (1953):

> "* * * where, as here, the alleged new evidence is recanting testimony, a particularly unreliable form of proof, and if true, involves a confession of perjury, we approach the question whether the trial judge erred in exercising his discretion to deny a new trial mindful of the principle phrased by Mr. Justice Cardozo in his concurring opinion in *People v. Shilitano,* 218 *N. Y.* 161, 112 *N. E.* 733, 739, *L. R. A.* 1916 F, 1044 (*N. Y. Ct. App.* 1916):
> '* * * I do not mean that to justify a new trial, he must have been convinced—firmly or with a sense of certainty convinced—that the first story of the witnesses was false and that their new story was true. He might act upon a reasonable probability. But if, on the contrary, he was convinced that the second tale was false, that a criminal league had been formed to set at naught the verdict of the jury and the judgment of the court, his duty was clearly marked. * * * He was not at liberty to shift upon the shoulders of another jury his own responsibility. That would have been to make the conspiracy triumph. He was charged with a responsibility to seek the truth himself.' "

■■ The test for the judge in evaluating a recantation upon a motion for a new trial is whether it casts serious doubt upon the truth of the testimony given at the trial and whether, if believable, the factual recital of the recantation so seriously

impugns the entire trial evidence as to give rise to the conclusion that there resulted a possible miscarriage of justice. His first duty is, therefore, to determine whether the recanting statement is believable. In the case *sub judice,* at the hearing on the motion for a new trial Allen testified that he had no recollection of signing the recanting affidavit, of the facts therein contained, or of the actual facts of the slaying. He thus backed away from and in effect repudiated his affidavit, thereby leaving no testimonial basis for the motion. In any event, the trial judge found that the statements made by Allen in the recanting affidavit were "unreliable" and "perjurious." We agree, and accordingly hold that the trial judge properly exercised his discretion when he denied the motion for a new trial.

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.