**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3549-18T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

AL-QAADIR GREEN, a/k/a AL
WILD, ALQUAADIR GRREN,
KYRELL HICKS, ALQUADIR
WHITE,

    Defendant-Appellant.

_____

Submitted May 26, 2020 – Decided June 18, 2020

Before Judges Messano and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 01-10-4345.

Al-Qaadir Green, appellant pro se.

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Al-Qaadir Green appeals from an order denying his motion for a new trial based on newly discovered evidence. Having reviewed the record in light of the applicable legal principles, we discern no basis to conclude the court abused its discretion by denying defendant's motion, and we affirm.

I.

Following a jury trial, defendant was convicted of two counts of murder, N.J.S.A. 2C:11-3(a)(1) or (2); two counts of felony murder, N.J.S.A. 2C:11-3(a)(3); one count of attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3; four counts of armed robbery, N.J.S.A. 2C:15-1; conspiracy to commit robbery, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:15-1; aggravated assault, N.J.S.A. 2C:12(b)(2); unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). The court imposed an aggregate sentence of two life terms, each subject to a thirty-year period of parole ineligibility.

In our decision on defendant's direct appeal from his conviction, we summarized the facts giving rise to the criminal charges against defendant and the evidence presented during his trial. State v. Green (Green I), No. A-4154-05 (App. Div. Aug. 7, 2008) (slip op. at 1-7). To provide context for our

discussion of defendant's pending appeal from the denial of his motion for a new

trial, we restate the summary from our decision:

> On the evening of May 18, 2001, Christian Made, Juana Ozuna, Sofia Rodriguez, Sofia's sister Roseanna Rodriguez and Marisol Rosario went to a club in Jersey City. They stayed until closing time and Made drove the group home . . . . He took the exit from Route 280 and at the bottom of the ramp, pulled his car over. Several witnesses said he did so because Ozuna was ill from drinking too much.
>
> They all got out of the car. Roseanna Rodriguez lived approximately two blocks away, and she decided to walk home. Another car pulled up, with three occupants. The driver and rear-seat passenger were male, the front-seat passenger was female; all were African-American. The driver asked if everything was all right, and the group said yes. Marisol Rosario noticed the rear-seat passenger lean forward and whisper something to the driver, and she immediately sensed trouble and told Sofia Rodriguez they should leave. As she said this, she saw the man sitting in the rear passenger seat get out of the car, holding a small black gun. She walked quickly across the street and hid in a stairwell.
>
> Sofia Rodriguez got into the driver's seat of their car and told Ozuna and Made they had to leave. She saw one of the two males from the other car strike Made, who got into the passenger seat next to Rodriguez and said they were being robbed.
>
> One of the robbers was standing next to Sofia Rodriguez, who was in the driver's seat. Rodriguez gave her pocketbook to the assailant and realized he had a gun. He then reached across her into the car and took

A-3549-18T4

the keys from the ignition. He then shot her in the head and she passed out.

Marisol Rosario, who was hiding across the street, heard several shots. When she heard the other car drive away, she ran to a cousin's house, which was nearby. When Sofia Rodriguez regained consciousness, Made was leaning on her; he had been shot in the right temple. Ozuna was lying on the street, in a pool of blood. Sofia Rodriguez ran to the same house as had Marisol Rosario, saying she had been shot.

Later that morning, Newark police gave Marisol Rodriguez a series of books containing mug shots of African-American males and African-American females. After looking through them, she did not see anyone she could identify.

Police and emergency personnel responded to the scene. Four .380 caliber shell casings and a projectile fragment were recovered from the front passenger seat of the victims' car. These shell casings matched casings and a bullet fragment recovered approximately two weeks earlier from the scene of a May 6 shooting at 611 Martin Luther King Boulevard. Testing revealed that the bullets recovered at the autopsies of Ozuna and Made were fired from the same gun that had been used in the earlier shooting.

Latique Mayse was the victim of the May 6 shooting, and he was interviewed by Detective Vincent Vitiello of the Newark Police Department. Detective Vitiello testified that Mayse gave a statement in which he said he was "absolutely certain" that defendant was the person who had shot him. Mayse identified defendant as the shooter in a photo array and also identified Omar

[Austin][1] as a person who was with defendant at the time of the shooting.

At defendant's trial, Mayse denied that defendant shot him on May 6, and said that he could not remember giving a statement to that effect and could not remember selecting defendant's picture. Mayse was then confronted with testimony he had given to a grand jury, in which he had said he met defendant on the street on May 6 and that defendant had a silver and black .380 caliber gun. Mayse had also told the grand jury that the earlier statement he had given to Detective Vitiello was accurate. In response, Mayse said he did not recall that testimony and that the grand jury transcript was inaccurate.

Investigator Robert Harris of the Essex County Prosecutor's Office learned of the ballistics match between the May 6 shooting and the killings of Made and Ozuna and that Mayse had identified defendant as the May 6 shooter. Based upon that, he prepared separate photo arrays including defendant's picture and [Austin's] picture and showed them to Sofia Rodriguez and Marisol Rosario. Neither could make any identification although Rosario indicated one picture might be that of the driver of the car.

Several weeks later, defendant and Omar [Austin] were arrested in New York City. Defendant had a .380 caliber gun and [Austin] a 9 millimeter at the time of their arrests. Ballistics tests linked that .380 caliber gun to the May 6 and May 19 shootings. Harris learned of

---

[1] In Green I, we referred to Omar Austin as "Omar Auston." In the affidavit he submitted in support of defendant's new trial motion, he used the surname "Austin." For purposes of clarity, we will refer to Omar Austin by the name he used to identify himself in his affidavit.

A-3549-18T4

these arrests and presented to Sofia Rodriguez and Marisol Rosario photo arrays that had been compiled by New York police. Rodriguez selected defendant's picture as the man who had shot her, and Rosario selected [Austin's] picture as the driver of the car. Defendant and [Austin] were arrested and charged with the May 19 shootings.

In October 2002, while defendant remained in jail awaiting trial, the prosecutor's office, in connection with an entirely unrelated matter, conducted a search of an apartment at 717 Martin Luther King Boulevard occupied by [Narik] Wilson.[2] The search uncovered a letter addressed to Wilson. The envelope bore defendant's name, inmate number and cell number and the address of the Essex County Jail. The jury heard the following redacted version of the letter:

> Little Bro, when me and O. was home we made some bad moves. This is where I need your help. That little bitch Ky is telling on me. If you got love for me, push her. That's the only person that's stopped me from coming home. Do that, Dog, I want to come home. Al.

According to the record, the word "push" means "kill" in street vernacular.

Omar [Austin] was tried before defendant and was convicted as an accomplice. Kyshael Ivery testified at

---

[2] Wilson did not testify at defendant's trial. In our opinion on defendant's direct appeal, we refer to Wilson as "Narique Wilson," Green I, slip op. at 6, but in connection with defendant's motion for a new trial, which is the subject of this appeal, Wilson submitted an affidavit identifying himself as "Narik Wilson." For purposes of clarity, we refer to Wilson by the name he used to identify himself in his affidavit.

A-3549-18T4

[Austin's] trial that she had been in the front seat of the car on May 19, 2001, and that [Austin] had a 9 millimeter gun and defendant a .380 caliber gun. She said at [Austin's] trial that she had seen defendant shoot one of the victims and take some cell phones which he later discarded behind the Seth Boyden homes in Newark. She also said she had identified a photograph of defendant.

At defendant's trial, Ivery said she could not recall who she was with on May 19. Based upon that, she was confronted with her earlier testimony. At defendant's trial, she said she could not recall that testimony because she had been high on drugs when she testified at [Austin's] trial and that she was, while on the stand at this trial, also high on drugs. On cross-examination, she denied being at the scene of the shootings or acting as a lookout.

Defendant presented only one witness, Police Officer Darlene Young, who was the first to respond to the scene of the shooting. She interviewed Sofia Rodriguez and put in her report that Sofia Rodriguez said she had been shot by a "black Hispanic male." The defense argued from that statement that defendant had been misidentified. This was the first homicide in which Officer Young had been involved, and the State asserted that Officer Young had made a mistake in preparing her report.

[Green I, slip. op. at 2-7].

We affirmed defendant's convictions and sentence, Green I, slip. op. at 26, and the Supreme Court denied his petition for certification, State v. Green, 196 N.J. 601 (2008).

7

Defendant filed a petition for post-conviction relief, asserting his trial and appellate attorneys provided ineffective assistance of counsel. The PCR court denied defendant's petition without an evidentiary hearing. We affirmed the PCR court's decision, State v. Green (Green II), No. A-3437-09 (App. Div. Jan. 11, 2012) (slip op. at 14), and the Supreme Court denied defendant's petition for certification, State v. Green, 211 N.J. 607 (2012).

In September 2012, defendant filed a habeas petition in the United States District Court for the District of New Jersey, challenging the constitutionality of his convictions. Green v. Warren (Warren), Civil No. 12-6148 (D.N.J. Dec. 20, 2013) (slip op. 1). The District Court denied defendant's application for a writ of habeas corpus. Warren, slip. op. at 1, 68.

In 2013, defendant filed a second PCR petition, which was denied in an order dated May 29, 2013. See State v. Green (Green III), No. A-08020-14 (App. Div. June 9, 2017) (slip op. at 2). Defendant did not appeal from that denial. Green III, slip op. at 2. Defendant, however, filed a "letter-motion for reconsideration," Green III, slip op. at 2, which we considered "a third PCR petition, responding to the first PCR judge's invitation to file a new petition based on newly discovered evidence," Green III, slip op. at 4. Defendant asserted his trial counsel was ineffective by failing to consult with a handwriting

expert to examine the "Narik Wilson" letter that was admitted in evidence at trial. Green III, slip. op. at 3. The trial court denied defendant's request for relief, and we affirmed the court's decision. Green III, slip op. at 6-7. It does not appear defendant filed a petition for certification with the Supreme Court from our decision.

Defendant next moved for a new trial based on newly discovered evidence.[3] More particularly, defendant cited as newly discovered evidence Kyshael A. Ivery's testimony during Austin's post-conviction proceeding.[4] According to defendant, Ivery testified she was involved in a romantic relationship with Austin at the time of the murders, spent the night of the murders with Austin, and had sexual relations with Austin that evening. Defendant also relied on a November 20, 2017 affidavit from Austin in which

---

[3] Defendant does not include the notice of motion filed in support of his motion, and the record does not otherwise reveal the date the motion was filed. In part, the motion was supported by a December 9, 2016 affidavit from Wilson, a July 6, 2017 affidavit from Ivery, and a November 20, 2017 affidavit from Austin. Thus, we surmise the motion was filed at some time after November 20, 2017.

[4] It appears a transcript from Austin's post-conviction relief proceeding was provided to the motion court because the court refers to the transcript in its written opinion on defendant's new trial motion. Defendant, however, has not supplied the transcript in the record on appeal. See R. 2:6-1(a)(1) (stating the appendix "shall contain . . . such other parts of the record . . . as are essential to the proper consideration of the issues").

A-3549-18T4

he claimed Ivery testified at this trial she did not know him or defendant but, in fact, at the time of the murders he and Ivery had a sexual relationship.

Defendant also relied on a July 6, 2017 affidavit from Ivery in which she stated that when she gave a January 29, 2002 statement to the police inculpating defendant and Austin in the murders, she was seventeen years old, but was not accompanied by her legal guardian.[5] Ivery asserted that if her legal guardian had been present, she "would not have made the statement" implicating defendant and Austin in the murders.[6]

In support of his motion for a new trial, defendant also relied on a December 9, 2016 affidavit from Narik Wilson, in which Wilson stated he intended to testify at defendant's trial but was unable to do so because he was in a coma and recovering from gunshot wounds. In his affidavit, Wilson also stated that during a police raid of his house, he witnessed a police officer take a letter

---

[5] Defendant did not include Ivery's purported January 29, 2002 statement in the record on appeal. See R. 2:6-1(a)(1).

[6] Ivery's putative affidavit does not properly support defendant's new trial motion because, although Ivery's signature is notarized, the document does not include a jurat "evidencing that the notary placed [Ivery] under oath at the time the document was executed," Tunia v. St. Francis Hosp., 363 N.J. Super. 301, 306 (App. Div. 2003), or a certification in lieu of an oath, R. 1:4-4(b). Thus, the purported facts set forth in the affidavit could not be considered by the court in its determination of defendant's motion. R. 1:6-6.

from the officer's pocket that defendant allegedly sent to him. According to the affidavit, Wilson later told the officers he never saw the letter prior to them showing it to him. Wilson also stated he was familiar with defendant's handwriting and the letter was not written by defendant.

In his affidavit, Wilson further stated he gave a statement to the police following the search of his home because the officers threatened they would charge him with various offenses and his mother would be charged "with the drugs that were found during the search of" their home.[7] Wilson relayed that he did not provide consent to the police to conduct the search during which the officer recovered the letter.

Defendant argued that if the newly discovered information provided by Austin, Ivery, and Wilson had been available at his trial, it would have changed the outcome. The court considered defendant's motion and, in a written opinion, rejected defendant's claimed entitlement to a new trial based on newly discovered evidence under Rule 3:20-1 and the standard established by the Supreme Court in State v. Carter, 85 N.J. 300 (1981).

---

[7] Wilson's purported statement to the police is not included in the record on appeal. See R. 2:6-1(a)(1).

The court rejected defendant's argument that Ivery's testimony about her sexual relationship with Austin and Austin's affidavit attesting to the relationship contradicted any statement or testimony Ivery made about her relationship with him. The court found defendant failed to "provide[] any evidence supporting his argument that . . . Ivery ever lied about ever[] being sexually involved with . . . [Austin]."

The court also found the information about the sexual relationship probably would not have changed the jury verdict if a new trial was granted. The court noted that Ivery gave a voluntary statement to the police regarding the murders, admitting she was with defendant and Austin, and described in detail the guns they both possessed. She further described the incident in precise detail, explained the manner in which the crimes were committed, and detailed not only defendant's participation in the murders, but Austin's as well.

The court also rejected defendant's claim Ivery's legal guardian was not called as a witness at trial because she suffered from "severe schizophrenia." The court found that whether or not the individual who was with Ivery when she gave her statement to the police in 2002 was Ivery's legal guardian "would not alter the verdict."

The motion court further rejected defendant's claim Wilson's affidavit constituted a recantation of an October 3, 2002 statement he gave to the police concerning defendant.[8] The court found that Wilson's affidavit explained the purported circumstances under which he gave the statement, but that the affidavit did not include a recantation of what Wilson told the police on October 3, 2002. The court also found the information in Wilson's affidavit about the letter would not have affected the outcome of the trial because, at the time of trial, Wilson was in a coma and unavailable to testify.

The court entered an order denying defendant's motion for a new trial. This appeal followed.

In his brief, defendant presents the following arguments for our consideration:

> POINT I
>
> [THE] TRIAL COURT ERRED IN DENYING PETITIONER'S MOTION FOR A NEW TRIAL BASED ON NEWLY-DISCOVERED EVIDENCE.
>
> POINT II
>
> APPELLANT SHOULD HAVE BEEN AFFORDED A HEARING TO ESTABLISH A RECORD OF THE NEWLY-DISCOVERED EVIDENCE BASED ON

---

[8] Defendant did not include Wilson's purported October 3, 2002 statement to the police in the record on appeal. See R. 2:6-1(a)(1).

THE AFFIDAVITS THAT WERE SUBMITTED AND FOR THE TRIAL COURT TO ACCESS THE CREDIBILITY OF THE WITNESSES.

We apply a three-prong test to determine whether a party is entitled to a new trial on the ground of newly discovered evidence. Carter, 85 N.J. at 314 (citing State v. Artis, 36 N.J. 538, 541 (1962)). A new trial is warranted "only if the evidence is (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." State v. Bey, 161 N.J. 233, 287 (1999) (citing Carter, 85 N.J. at 314). As the Supreme Court reiterated in State v. Ways, "all three prongs of that test must be satisfied before a defendant will gain the relief of a new trial." 180 N.J. 171, 187 (2004) (citing Carter, 85 N.J. at 314).

In Ways, the Court explained that "[a] jury verdict rendered after a fair trial should not be disturbed except for the clearest of reasons." Ibid. "Newly discovered evidence," the Court cautioned, "must be reviewed with a certain degree of circumspection to ensure that it is not the product of fabrication, and, if credible and material, is of sufficient weight that it would probably alter the outcome of the verdict in a new trial." Id. at 187-88; see also State v. Conway,

A-3549-18T4

193 N.J. Super. 133, 171 (App. Div. 1984) (stating that motions for a new trial based on newly discovered evidence are typically "not favored and should be granted with caution by a trial court since it disrupts the judicial process" (citing State v. Haines, 20 N.J. 438, 443 (1956))).

"A motion for a new trial is addressed to the sound discretion of the trial court, and its determination will not be reversed on appeal unless there has been a clear abuse of that discretion." State v. Puchalski, 45 N.J. 97, 107 (1965) (quoting Artis, 36 N.J. at 541). "An abuse of discretion 'arises when a decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

We defer to a trial court's fact-finding, moreover, even where it does not depend on assessing live witnesses' demeanor. The trial court's factual findings therefore remain entitled to deference even though the record before the court in this case consisted solely of documentary evidence. An appellate court is simply not as experienced nor as capable as the trial court at making credibility assessments or factual findings. State v. S.S., 229 N.J. 360, 379-81 (2017). Thus, we should not disturb a trial court's factual findings made from a

documentary record if those findings are supported by "sufficient credible evidence." Id. at 381 (citing State v. Gamble, 218 N.J. 412, 424 (2014)).

Defendant first contends the newly discovered information showing Ivery and Austin had a sexual relationship at the time the murders were committed demonstrated that "Ivery provided a false statement [and] gave perjured testimony at [defendant's] trial." We reject the argument because it is a conclusory assertion untethered to any citation to the record or reference to any evidence establishing Ivery misrepresented the nature of her relationship with Austin. Defendant does not include Ivery's purported prior "false statement" to the police in the record on appeal or the record of her testimony during Austin's trial, and he does not cite to any portion of his trial record showing Ivery lied about her relationship with Austin.[9] See State v. Cordero, 438 N.J. Super. 472,

_____

[9] In defendant's brief on appeal, he asserts that on January 29, 2002, Ivery gave a statement to the police that on the evening of the murders "she was only receiving a ride and she knew [defendant and Austin] for three days." He also claims Ivery's testimony during Austin's trial "showed that she committed perjury," but he does not describe the allegedly false testimony. As noted, defendant's claims constitute nothing more than bald assertions and unsubstantiated arguments because he fails to provide either the January 29, 2002 statement or Ivery's testimony during the Austin trial in the record on appeal. See R. 2:6-1(a)(1). However, even accepting defendant's assertions as an accurate account of Ivery's statement to the police and of her purported testimony during Austin's trial, the newly discovered evidence that she had a sexual relationship with Austin is simply not inconsistent with, and does not

16

489 (App. Div. 2014) (explaining an appellate court cannot review an issue where the necessary portions of the record are not included in the record on appeal). In fact, during her testimony at defendant's trial, Ivery never characterized her relationship with Austin in any manner and was never asked to do so.

Moreover, even if Ivery had previously denied having a sexual relationship with Austin in either her statement to the police or testimony during Austin's trial, defendant failed to demonstrate the newly discovered evidence they had such a relationship "would probably change the jury's verdict if a new trial were granted" in his case. See Carter, 85 N.J. at 314; see also State v. Nash, 212 N.J. 518, 549 (2013). In the first instance, the information would have challenged only Ivery's credibility, and therefore it would have been "merely . . . impeaching." See Ways, 180 N.J. at 187.

More significantly, the record does not support a finding the information would probably have changed the outcome of the trial. During defendant's trial, Ivery testified that on January 29, 2002, she signed a photographic identification form acknowledging she selected defendant's photograph as the individual who

undermine, her purported statements she knew Austin for only three days at the time the murders were committed.

A-3549-18T4

shot the driver of the victims' vehicle in the head.  Ivery also testified she could not remember the events related to the murders, but she was questioned in detail about her testimony in a prior proceeding during which she provided a precise account of the murders, including details—like the calibers of the guns she observed in defendant's and Austin's possession, the location of the victims in their vehicle, and the items taken during the robbery—that would have only been known to someone with personal knowledge of what occurred.[10]  Moreover, Ivery's account of the murders during her sworn testimony in the prior proceeding, including her description of the respective actions of defendant and Austin, was consistent with the testimony of other witnesses and the forensic evidence.  The evidence showing defendant was found in possession of the murder weapon provided additional, and substantial, proof of defendant's guilt.

In sum, the "thorough, fact-sensitive analysis" required "to determine whether the newly discovered evidence would probably make a difference to a jury," Ways, 180 N.J. at 191, permits only a single conclusion here.  Information showing Ivery had a sexual relationship with Austin at the time of the murders would not have undermined her account of the crimes because her testimony

---

[10]  The prior proceeding during which Ivery testified was Austin's trial on the charges against him arising from the robbery and murders.

was corroborated by other testimony and evidence, and there was other independent evidence establishing defendant's guilt. In fact, information concerning Ivery's relationship with Austin may have likely supported her credibility; it would have explained her presence with Austin on the evening the murders were committed.

Defendant also claims the State violated its duty and constitutional obligation to turn over exculpatory evidence concerning Ivery's purported relationship with Austin. See Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). "The Brady rule is invoked where information is discovered after trial 'which had been known to the prosecution but unknown to the defense.'" State v. Carter (Carter II), 91 N.J. 86, 111 (1982) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). We find the argument lacks sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(2), other than to note defendant makes no showing information concerning Ivery's relationship with Austin was known to the State at the time of defendant's trial.

Defendant last asserts that Wilson's December 9, 2016 affidavit revealed facts that "could have change[d] the outcome of the trial." Defendant reasons that "Wilson gave a statement in 2002," and explained in his December 9, 2016 affidavit that his 2002 statement was made "under duress, at the threat of his mother being arrested and losing custody of his younger brother if he did not cooperate."

We reject defendant's contention because he fails to provide the record allowing appropriate consideration of it. See Cordero, 438 N.J. Super. at 489. Defendant has not provided Wilson's 2002 statement and, thus, defendant has not sustained his burden of demonstrating the newly discovered evidence would have changed anything at all. The failure to provide the 2002 statement renders it impossible to assess whether the 2016 affidavit even includes information that is material to the issues presented at trial or merely cumulative, impeaching or contradictory; could have been discovered by reasonable diligence before the trial; or would probably change the verdict if there was a new trial. See Carter, 85 N.J. at 314.

The record also shows Wilson was in a coma at the time of defendant's trial and, as a result, he was unable to testify. His purported 2002 statement was not admitted in evidence at the trial so his statement to the police, whatever it

may have been, did not have any effect on the outcome of defendant's trial. As such, it cannot be logically concluded that the information in Wilson's 2016 affidavit would have changed the jury's verdict.

The information in Wilson's 2016 affidavit, however, would have contradicted the testimony of the officer who testified at defendant's trial that he found the letter from defendant to Wilson during the 2002 raid of Wilson's home. In addition, the information in Wilson's affidavit—that in Wilson's opinion the letter was not in defendant's handwriting—would have supported an argument the letter was not written by defendant.

In his brief on appeal, defendant does not expressly argue or explain why the information in Wilson's affidavit would have probably changed the jury's verdict if a new trial was granted, and our own independent review of the record establishes the information would probably not have changed the jury's verdict. The State's case was not dependent on the letter recovered from Wilson's home, and putative testimony from Wilson asserting defendant did not author the letter "would [not] have the probable effect of raising a reasonable doubt" about defendant's guilt. Nash, 212 N.J. at 551 (quoting Ways, 180 N.J. at 189).

Testimony from Wilson concerning the letter would have been merely contradictory to the officer's testimony the letter was recovered from Wilson's

home because the evidence about the letter did not "strike[] at the heart of the [State's] case," nor did it "shake the very foundation of the State's case." Ways, 180 N.J. at 189. To the contrary, even without regard to the letter, the evidence against defendant was substantial. The evidence included: testimony explaining defendant was later found in possession of the murder weapon; Ivery's testimony detailing defendant's actions and the weapons defendant and Austin used to commit the offenses; Sophia Rodriquez's out-of-court and in-court identifications of defendant; and Mayse's identification of defendant as the shooter in the May 6, 2001 incident during which the gun used to commit the May 19, 2001 murders was also used. Under those circumstances, we discern no basis to conclude the information in Wilson's affidavit "would probably make a difference to the jury," id. at 191, and defendant offers no basis in the record to conclude otherwise.

We are therefore convinced defendant failed to demonstrate the motion court abused its discretion by denying his motion for a new trial based on newly discovered evidence. The court correctly determined defendant failed to sustain his burden of establishing each of the three prongs of the Carter standard or that a new trial is required in the interests of justice, see R. 3:20-1.

To the extent we have not directly addressed any argument made by defendant, it is because we have determined the argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3549-18T4